NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0271n.06

Nos. 09-1536/09-1537

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | **Mar 13, 2012** |
| | ) | LEONARD GREEN, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| SURINDER DHALIWAL and BALJIT SINGH, | ) | THE WESTERN DISTRICT OF |
| | ) | MICHIGAN |
| Defendants-Appellants. | ) | |
| | ) | |

Before: BOGGS and GIBBONS, Circuit Judges; RUSSELL,[*] Senior District Judge.

RUSSELL, Senior District Judge. Defendants Surinder Dhaliwal ("Dhaliwal") and Baljit Singh ("Baljit") appeal following their convictions for conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Dhaliwal and Baljit now raise various issues on appeal. We conclude that all of them are meritless, and we AFFIRM the convictions.

**I. FACTUAL BACKGROUND**

On April 28, 2008 the Department of Homeland Security, Bureau of Immigration and Customs Enforcement ("ICE"), received information from Canadian law enforcement authorities that a green semi-trailer truck bearing the company logo "GTX" may be transporting a large amount of cocaine through the United States to Canada. Based upon this information, ICE agents located the green GTX truck at a Flying J truck stop in Gary, Indiana that same night. After continuing

---

[*] The Honorable Thomas B. Russell, United States Senior District Judge for the Western District of Kentucky, sitting by designation.

surveillance at the Flying J through the night, ICE agents observed a white GTX semi-trailer truck arrive at the truck stop the next morning. How these GTX trucks came to be at the Flying J, what occurred at the Flying J, and what occurred after the trucks left the Flying J constitute the heart of the conspiracy charge against Dhaliwal, Baljit, and their coconspirators. Many of these facts were controverted.

Appellant Dhaliwal, the driver of the green GTX truck, testified at trial that he started receiving telephone calls from Pauma, another truck driver, while he was in Salinas, California to pick up a load of strawberries. After leaving California, Dhaliwal proceeded along the route to his next stop in Toronto, Canada. On April 27, 2008, Dhaliwal was awakened by two men knocking on the door of his truck while he slept at a truck stop in Utah. The men, who were armed, gave Dhaliwal three duffel bags full of cocaine to transport in his truck and threatened Dhaliwal's and his children's lives. After the men left, Dhaliwal received several threatening calls from Pauma. Dhaliwal testified that during these calls, he repeatedly told Pauma he would throw out the duffel bags. Dhaliwal arrived at the Flying J truck stop in Gary, Indiana on April 28, 2008. In the middle of the night, Dhaliwal tried to move his truck but discovered that his truck's air hoses were cut. Dhaliwal had his truck repaired and then went back to sleep.

Co-conspirator and co-defendant Tarlochan Singh Guron ("Guron"), the driver of the white GTX truck, testified that he received assistance from an individual named Jeswinder Singh ("Jeswinder") when he experienced problems with his truck in Montana on April 24, 2008. After getting his truck fixed, Guron made two stops in California before arriving at a Love's gas station in Utah to spend the night. The next morning, Guron noticed Dhaliwal's green truck at the Love's

and observed Dhaliwal with socks on his hands and brown-colored blocks in the truck. Guron testified that he then called his boss, Karamjit Gill (the owner of GTX trucking), and relayed his observations. According to Guron, Gill told him that what he saw may be drugs and that he should stay behind to follow Dhaliwal. Gill also informed Guron that he would call the authorities and report the drugs. Guron testified that, at the request of Gill, he followed Dhaliwal from Utah and arrived in Gary, Indiana on April 28, 2008. That night, Pauma told Guron over the phone that Dhaliwal's truck had some "stuff" in it and that Guron should let Dhaliwal put the "stuff" in Guron's truck. According to Guron, Pauma threatened him.

Appellant Baljit testified at trial that he and his wife owned a trucking business, which closed in April of 2008 due to high gas prices. Searching for new business opportunities, Baljit spoke to co-conspirator Rajinder Singh ("Rajinder") about his interest in purchasing a gas station in Indiana. Baljit testified that, in another telephone conversation on April 28, 2008, Rajinder told him that if he wanted to see the gas station then he would introduce him to a person who would be able to help.[1] Baljit then purchased a plane ticket to travel from Seattle to Chicago, Illinois on April 28, 2008. Phone records introduced at trial showed that Baljit called Jeswinder immediately before boarding the plane in Seattle. After arriving at in Chicago in the early morning of April 29, 2008, Baljit called Rajinder, rented a silver Chevy Cobalt, and drove to the Flying J in Gary, Indiana.

---

[1] On the morning of the arrests, Rajinder told the police that Baljit had flown to Chicago in order to see Rajinder about getting a job and potentially moving to New Jersey. At trial, Rajinder testified that that was "just an excuse to the police."

3

Rajinder[2] testified that he received a call on April 28, 2008 from an individual named Sarbjeet Singh ("Sarbjeet") who advised him to contact Jeswinder about a plan to steal cocaine from a truck in Indiana. According to Rajinder, Jeswinder stated that the cocaine in the truck belonged to him and to four other people: Guron, Pauma, Gill,[3] and another individual whose name Rajinder could not recall. Jeswinder asked Rajinder to steal the cocaine from the truck, thereby ripping off his other partners. Initially, Rajinder declined because he would not be able to make it to Gary, Indiana in time to intercept the truck. He later agreed to the plan when Jeswinder explained that he and Guron would delay the truck at the Flying J until Rajinder could get there. Rajinder further testified that he made arrangements for Baljit to help him steal the cocaine.[4]

Rajinder and two other charged co-conspirators, Sandeep Singh ("Sandeep") and Paramjeet Singh ("Paramjeet"), arrived at the Flying J in Gary, Indiana at approximately 7:00 a.m. on April 29, 2008. According to Rajinder, for his role in the plan, he would be paid $20,000 to distribute among himself, Sandeep, Paramjeet, and Baljit. He and Baljit were then to split another $20,000. Rajinder also testified that Dhaliwal was to receive $25,000 for bringing the cocaine to Gary, Indiana and then an additional $15,000 to take it further.

Rajinder and Baljit testified to slightly divergent versions of events after their separate arrivals at the Flying J. Rajinder testified that, after greeting Baljit in the Flying J store, they walked

---

[2] Rajinder Singh pleaded guilty to the conspiracy charge and testified at trial for the government.

[3] It is unknown whether this is Karamjit Gill, the owner of GTX Trucking.

[4] However, on cross-examination, Rajinder testified that Singh had been sent to Gary, Indiana by Sarbjeet.

into the restroom together, followed by Jeswinder and Guron. In the restroom, Jeswinder introduced himself to Rajinder and introduced Guron as "Uncle Tarlochan."[5] Rajinder testified that, according to the plan discussed in the restroom, Guron was going to ask Dhaliwal to go to the showers with him. Rajinder was to steal the cocaine from the green truck while Dhaliwal showered, and then place the duffel bags in Jeswinder's truck. Rajinder further testified that after exiting the restroom and going into the Flying J store, Baljit picked up duct tape and gloves and gave them to Paramjeet to purchase. According to Baljit's testimony, Rajinder gave the duct tape and gloves to Paramjeet to purchase.

Meanwhile, Dhaliwal left the Flying J in his green truck and proceeded onto Interstate 94 east. Upon discovering that the green truck was gone, Rajinder called Jeswinder, who told him to follow the green truck to exit 108. At exit 108, a garbage truck was to be waiting to take the cocaine from the green truck and to further transport the cocaine to Canada. Rajinder testified that Baljit gave him the keys to his rented silver Colbalt and told him to drive. According to Baljit, Rajinder asked for the car keys so that he could drive. Baljit sat in the back seat of the car with Paramjeet, while Rajinder drove and Sandeep sat in the front passenger seat. The silver Cobalt followed the trucks on to Interstate 94 and eventually to the Michigan Welcome Center.

Guron testified that as he was leaving the Flying J to follow Dhaliwal's green truck, Pauma called him again and asked whether Guron met "his guys" and referred to a silver car and a black car. Guron further testified that Pauma threatened him and his family. Dhaliwal testified that sometime

---

[5] Guron and Singh both testified that they did not take an active part in this conversation.

after leaving the Flying J, he received a call from Guron, who told him that he would take the bags from him at the Michigan Welcome Center. Dhaliwal pulled into the Michigan Welcome Center ahead of Guron. When Guron pulled into the Michigan Welcome Center, he parked next to Dhaliwal's green truck. After looking around, Guron opened the window of his truck and Dhaliwal threw the duffel bags inside.

Guron then left the Michigan Welcome Center in the white truck, followed by Dhaliwal in the green truck. As Dhaliwal was leaving the welcome center, the silver Cobalt pulled in front of him and blocked the interstate ramp. Rajinder, whom Dhaliwal did not know at the time, got out of the car and approached the green truck. To confirm that the duffel bags were no longer in the green truck, Rajinder stepped up onto the truck and looked inside. When Rajinder returned to the car, they started to once again follow the white and green trucks along Interstate 94. When Rajinder got close enough to the white truck, he recited its trailer number and company number on the phone to Jeswinder. Jeswinder confirmed that it was Guron's truck. Baljit testified that he did not know what was going on, but that Rajinder was angry and was talking on the phone about "beating and violence." According to Baljit, Rajinder told him that, "We will help you and we will take you to the Detroit. But do not interfere in our work." Baljit maintained that he was merely an innocent bystander in the events of April 29, 2008.

During the course of surveillance on Interstate 94, the ICE agents noticed that a silver Cobalt seemed to be following the green and white trucks. After observing the exchange take place at the Michigan Welcome Center, where the duffel bags from the green truck were transferred to the sleeper compartment of the white truck, the ICE agents continued to follow the green and white

trucks along Interstate 94. Eventually, all three vehicles were pulled over with the help of the Michigan State Police. After Guron consented to a search of the white truck, officers discovered three duffel bags containing a total of 63.3 kilograms of cocaine. Dhaliwal, Baljit, Guron, Rajinder, Sandeep, and Paramjeet were all arrested and charged with conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 846 and 841(a)(1).[6]

At trial, the government presented border entry information showing that four of the six defendants entered the United States from Canada during a two-day period: Guron entered the United States on April 22, 2008 at Sweetgrass, Montana; Baljit entered on April 23, 2008 at Blaine, Washington; Rajinder entered on April 23, 2008 at Buffalo, New York; and Dhaliwal entered on April 23, 2008 at Orville, Washington.

Phone records introduced at trial showed that Guron and Dhaliwal had frequent telephone contact with each other in the days leading up to April 29, 2008. Guron and Dhaliwal each had frequent telephone contact with Pauma and Jeswinder. Based on an examination of phone records, an ICE agent testified that Guron, Dhaliwal, and Jeswinder traveled "in sync" from California to Gary, Indiana.

---

[6] Before trial, Rajinder, Sandeep, and Paramjeet all pleaded guilty. Dhaliwal, Guron, and Baljit Singh were tried together. Jeswinder Singh, a Canadian citizen, was not arrested. Pauma and Sarbjeet were never identified.

## II.  ANALYSIS

### A.  Failure to Disclose Material Evidence: Brady Violations

On appeal, Dhaliwal and Baljit both contend that the government violated their rights under *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding evidence that would have supported Guron's position at trial–that he reported the discovery of the cocaine to his boss, Karamjit Gill, who contacted the Royal Canadian Police in Windsor, who subsequently  contacted the United States Immigration and Customs Enforcement.  Although they cannot identify the specific evidence that is in the possession of the government, Dhaliwal and Baljit  maintain that this is because the record has not been supplemented with a more accurate description of the documents or information in the possession of the government.

The basis for the appellants' *Brady* claims stems from a pre-sentencing motion for a new trial filed by their co-defendant, Guron, who asserted a duress defense at trial.  In that motion, Guron asserted that the government "pressure[d]" an "essential witness," Karamjit Gill, not to testify at trial and failed to disclose information relating to the initiation of this investigation based upon information Guron provided to Gill, his employer.  In response, the government  agreed that it was "in possession of information which may have corroborated the claim of [Defendant Guron] that he presented at trial, that he himself provided the information which led to his arrest and this Indictment."  The district court granted Guron's motion for a new trial and the government thereafter moved to dismiss the indictment against Guron only.  Dhaliwal and Baljit now claim on appeal that they are likewise entitled to a new trial based upon this alleged *Brady* violation.

### i. Dhaliwal's *Brady* Claim

Dhaliwal's *Brady* claim is not properly before this Court. On April 13, 2009, the district court sentenced Dhaliwal to 180 months of imprisonment. Dhaliwal filed a notice of appeal on April 17, 2009. Thereafter, on May 29, 2009, Dhaliwal filed a motion for a new trial. If a defendant files a notice of appeal before a motion for a new trial, the district court may not grant a motion for new trial without a remand. *U.S. v. Blanton*, 697 F.2d 146, 148 (6th Cir. 1983). However, the district court does have three options. *Id*. First, the district court can certify that it is inclined grant a new trial. *Id*. Second, the district court can deny the motion for a new trial outright if it feels that it would not grant the motion in any event. *Id*. Third, the district court may decline to certify, or decline to rule with finality on the motion, until after the appeal is concluded. *Id*. "Since this is not a final order and hence is not appealable, the motion may be reasserted, under Rule 33, when the case returns from the court of appeals." *Id*. Here, the district court chose the third option and declined to rule upon Dhaliwal's motion for a new trial. Accordingly, there is no district court ruling for this court to review and Dhaliwal's appeal as it pertains to this issue is dismissed.

Related to his *Brady* claim, Dhaliwal contends on appeal that his Sixth Amendment right to a fair trial and his Fifth Amendment Due Process rights were violated when the government improperly pressured Karamjit Gill not to testify at trial. Dhaliwal further contends that, during closing arguments, the prosecutor improperly commented on the failure of Guron and Dhaliwal to present Karamjit Gill as a witness to corroborate their version of events. Because Dhaliwal raised these prosecutorial misconduct claims in his motion for a new trial, Dhaliwal's appeal as it pertains to this issue is also dismissed.

### ii. Baljit's *Brady* Claim

Unlike Dhaliwal, Baljit did not file a motion for a new trial in the district court, but instead raises the issue for the first time on appeal. Where "the defense counsel did not make a motion for a mistrial or raise the question of a possible *Brady* violation to the district court, we review at most for plain error." *United States v. Crayton*, 357 F.3d 560, 569 (6th Cir. 2004). Because Baljit did not raise the issue of a possible *Brady* violation in the district court, "[i]t could also be said that defendant waived his *Brady* claim, such that even plain error review is not required." *Id*. at 569 n. 3 (citing *United States v. Scarborough*, 43 F.3d 1021, 1025 (6th Cir. 1994) and *United States v. Reeves*, 215 F.3d 1328 (Table), 2000 WL 687649 at *2 (6th Cir. May 19, 2000)).

Pursuant to *Brady*, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87. For a defendant to assert a successful *Brady* claim, he must show the following three essential elements: (1) the evidence is favorable to him; (2) the evidence was suppressed by the government; and (3) the suppression caused him prejudice. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). "'*Brady* is concerned only with cases in which the government possesses information which the defendant does not. Further, there is no *Brady* violation if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question, or if the information was available to him from another source.'" *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007) (quoting *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)).

To demonstrate prejudice, the defendant must show that the evidence at issue is material. *Strickler v. Greene*, 527 U.S. 263, 282 (1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S 667, 682 (1985). Generally, evidence that could impeach the credibility of a witness is material. *Schledwitz v. United States*, 169 F.3d 1003, 1011 (6th Cir. 1999).

Here, the government contends that the evidence at issue is not *Brady* material because Karamjit Gill was an alternate source of the information and the defendants were put on notice of these same facts before trial through a pre-trial motion filed by Guron.[7] Irrespective of this notice, Baljit contends that the government never provided an accurate description of the documents within its control. The government did present the raw materials in its possession to the district court for an *in camera* review related to Guron's motion for attorneys' fees pursuant to the Hyde Amendment. In denying Guron's discovery demand as it related to his Hyde claim, the district court did not mention the nature of the evidence or its potential for *Brady* material as it related to Baljit or any other defendant.

With respect to the nature of the raw materials in the government's possession, it is apparent that the evidence is something other than the phone records of Karamjit Gill. The government

---

[7] Defendant Guron's pre-trial motion for a jury instruction on the duress defense stated that Karamjit Gill triggered the investigation after receiving information from Guron regarding Dhaliwal with three duffel bags of what appeared to be drugs. The motion specifically named the employer, Karam Gill, and the trucking company, Gooroo Express Company (GTX).

adamantly denied withholding any phone records of Karamjit Gill and insisted that it did not have those records until it received them as an attachment to Guron's motion for a new trial. However, the government must be in possession of some other materials which it presented for an *in camera* review. Although the government admitted that the information it possesses supports Guron's position at trial, the nature of this information is unknown to the defendants and has not been disclosed by the government. Accordingly, we cannot conclusively determine whether the evidence at issue is *Brady* material.

In some cases where a defendant alleges a *Brady* violation on appeal, "[o]nce a defendant establishes a basis for his claim that the records sought contain material evidence, even though he cannot articulate with specificity the materiality of those records, remand for *in camera* review may be appropriate." *United States v. White*, 492 F.3d 380, 410 (6th Cir. 2007). In *White*, the defendants learned after trial that an individual on the government's list of potential witness received an award for fraud examination and cited the defendants' convictions among his list of successful cases. *Id*. at 390. The defendants then brought a motion to compel that potential witness to produce any documents he reviewed at the government's request in preparing to testify. *Id*. After the district court denied that motion, defendants filed Freedom of Information Act ("FOIA") requests to obtain documents pertaining to the case that were either prepared or received by the potential witness. *Id*. They encountered substantial obstacles and ultimately received only a small portion of the documents requested. *Id*. The district court denied the defendants' motion for a new trial and a request for an evidentiary hearing, and the defendants appealed. *Id*. On appeal, this court explained that defendants were unable to make the requisite showing that the documents were material and

favorable because the government went to great lengths to deny the defendants access to the requested documents. *Id*. at 413. However, the defendants did establish a sufficient basis for their claim that the documents constituted "material evidence" because the potential witness cited their conviction among his successes and the FOIA request revealed a substantial body of responsive documents. *Id*. Thus, this court vacated the district court's order denying the motion for new trial and remanded the matter to the district court with instructions that the court conduct an evidentiary hearing wherein the defendants could properly probe the nature of the evidence. *Id*.

Here, Baljit contends that the evidence at issue could have been used to impeach Guron's testimony relating to Baljit's role in the alleged conspiracy. Specifically, Baljit points to the events that occurred in the Flying J restroom and notes that "[w]hether Guron related this event and/or other potentially incriminating information about [Baljit]" when he provided the information leading to his arrest "would have been ripe grounds for impeachment." However, because Guron called Karamjit Gill about the drugs *before* the defendants arrived at the Flying J, Guron's failure to mention Baljit during this conversation would not have been grounds for impeachment. Instead, information that would support Guron's position at trial would only serve to bolster Guron's credibility.

Baljit further contends that the evidence at issue could have been used to impeach the credibility of the law enforcement officers and the nature and professionalism of the investigation. As a basis for this claim of materiality, Baljit states: "The officers receiving this information clearly conveyed that they did not believe Guron's version of events since they disregarded the call and charged him as a conspirator in the drug trafficking scheme. This would have been a valuable area

13

of cross-examination." However, this potential area of cross examination is unrelated to Baljit and the evidence regarding his role in the conspiracy.

Ultimately, Baljit cannot establish a basis for his claim that the materials in the government's possession are material evidence because whether or not Guron called Karamjit Gill and reported the drugs is unrelated to Baljit's role in the conspiracy. Therefore, there was no violation of Baljit's constitutional rights under *Brady* and it is not necessary to remand the case for an *in camera* examination of the material in the possession of the government.

Accordingly, Baljit's *Brady* claim fails.

## B. Failure to Give Multiple-Conspiracy Jury Instructions

Dhaliwal contends that the district court erred in denying his request for a multiple conspiracy jury instruction because the evidence produced at trial established the existence of two separate conspiracies: one conspiracy to smuggle drugs into Canada and a separate conspiracy to rob Dhaliwal of the drugs he was transporting. In response to Dhaliwal's request for a multiple conspiracy instruction, the district court ruled on the record that:

> . . . I once again reiterate that in my view the government's evidence is that all of the defendants were involved in a singular purpose conspiracy to distribute the cocaine. And just to give a little meat to those bones, based on the evidence the government put forward, there were a number of men who were involved in the conspiracy, at least from the beginning, including Mr. Dhaliwal, Mr. Guron, Pamma [sic], Jeswinder, and perhaps Mr. Gill. At some point in time, Jeswinder and perhaps Guron and Sarbjeet brought Rajinder into the conspiracy. That was followed by Rajinder and perhaps Sarbjeet bringing Baljit into the conspiracy, if in fact they weren't part of it from the beginning. And, finally, Rajinder brought in Sandeep and Paramjeet. My view of the testimony and the evidence is that all of these men were brought into a single purpose conspiracy . . . .

14

Dhaliwal argues on appeal that his ruling was in error and that the error constitutes grounds for a new trial.

This court reviews a district court's refusal to give a jury instruction for abuse of discretion. *United States v. Roth*, 628 F.3d 827, 833 (6th Cir. 2011) (quoting *H.C. Smith Invs., LLC v. Outboard Marine Co.*, 377 F.3d 645, 650 (6th Cir. 2004)). The district court's decision not to give the requested jury instruction will be reversed "only when (1) the requested instruction is a correct statement of the law; (2) the requested instruction is not substantially covered by other instructions actually delivered; and (3) the failure to give the requested instruction impairs the defendant's theory of the case." *Id*. at 835 (quoting *United States v. Tarwater*, 308 F.3d 494, 510 (6th Cir. 2002)). However, if the defendant suffers no actual prejudice reversal is not required. *United States v. Caver*, 470 F.3d 220, 246 (6th Cir. 2006).

To succeed on this claim of error, Dhaliwal must first show that his requested jury instruction was a correct statement of the law. *See Roth*, 628 F.3d at 835. The Sixth Circuit directs that Pattern Jury Instruction 3.08 should be given when "there [is] evidence of multiple conspiracies and a possible variance . . . ." *United States v. Maliszewski*, 161 F.3d 992, 1014 (6th Cir. 1998). "The principal considerations to determine the number of conspiracies are the existence of a common goal, the nature of the scheme, and the overlapping of the participants in various dealings." *United States v. Warman*, 578 F.3d 320, 341-42 (6th Cir. 2009) (quoting *United States v. Smith*, 320 F.3d 647, 652 (6th Cir. 2003)). "[A] single conspiracy does not become multiple conspiracies simply because each member of the conspiracy did not know every other member, or because each member did not know of or become involved in all of the activities in furtherance of the conspiracy." *United States v.*

*Warner,* 690 F.2d 545, 549 (6th Cir. 1982). "[T]o prove a single conspiracy, the government must

show that each alleged member agreed to participate in what he knew to be a collective venture

directed toward a common goal."

*Id.* (internal quotations omitted). However, the connections between conspirators can be

minimal. *United States v. Swafford,* 512 F.3d 833, 841 (6th Cir. 2008).

Here, the proposed multiple conspiracy jury instructions submitted by Dhaliwal to the

district court included indisputably incorrect statements of the law.[8] An instruction stating that the

---

[8] Dhaliwal's  proposed instructions stated the following:

MULTIPLE CONSPIRACIES
MATERIAL VARIANCE FROM THE INDICTMENT

(1)   The Indictment charges that the defendants were members of one single
conspiracy to possess with intent to deliver over five kilos of cocaine.
(2)  The defendants have argued that there were really two separate conspiracyone
the drug conspiracy between certain individuals, and the second being a  separate
conspiracy between Rajinder Singh, Sandeep Singh, Paramjeet  Singh, Jaswinder
LNU, Sarabjit LNU, and a Mr. Gill, to rob Surinder  Dhaliwal.
(3)  When there are numerous alleged co-conspirators, and numerous alleged
conspiracy objects, the jury must determine whether there was more than one
unlawful agreement or indeed, no agreement at all.  This is a question of fact  for the
jury to determine.
(4)  If the evidence suggested the existence of more than one conspiracy, then the
evidence would not establish the single conspiracy charged.
(5)  Multiple conspiracies exist when there is more than one unlawful agreement,
even if they all seek to achieve the same, or some of the same, purposes, or  have
overlapping membership.
(6) If you have reasonable doubt about whether there is a single conspiracy, or  more
than one conspiracy, then none of the defendants may be convicted  under Count I
of the indictment.

defendants may not be convicted if there is a reasonable doubt about whether there was a single

conspiracy or multiple conspiracies is plainly inaccurate. *See* Caver, 470 F.3d at 236-37;

*Sixth Circuit Pattern Jury Instructions*, § 3.08 (2005) at ¶¶3-4. Likewise, it is also incorrect that

if the evidence suggests the existence of more than one conspiracy then the evidence could not

establish the single conspiracy charged in the indictment. *See United States v. Davenport*, 808 F.2d

1212, 1217 (6th Cir. 1987) (noting that it is possible for the same set of facts to support both a

finding of a single conspiracy and a finding of multiple conspiracies). Accordingly, the district court

did not err in denying Dhaliwal's request for the proposed jury instruction.

Even if the evidence produced at trial was sufficient to allow a jury to find multiple

conspiracies and the proposed jury instructions did not include incorrect statements of the law,

Dhaliwal was not prejudiced by the district court's failure to give a multiple conspiracy instruction.[9]

"[T]he primary risk associated with the failure to give a multiple conspiracy instruction is the

transference of guilt from defendants involved in one conspiracy to defendants involved in another

conspiracy, such that a defendant is convicted for a conspiracy for which he was not indicted."

*Caver*, 480 F.3d at 246. Here, there is little risk Dhaliwal was convicted for a conspiracy to steal

cocaine from himself–a conspiracy for which he was not indicted. Instead, Dhaliwal's conviction

for conspiring to distribute cocaine was based on the abundant evidence presented by the

---

[9] On appeal, Dhaliwal's principal contention is that he was prejudiced by the inclusion of hearsay statements that were not in furtherance of the conspiracy charged in the indictment. The admissibility of these various statements made by his co-conspirators was determined by the district court prior to their admittance and was not a result of the district court's failure to give the multiple conspiracy instruction. Dhaliwal does not challenge these rulings on appeal.

17

government, Dhaliwal's own testimony that he drove from Utah to Michigan with the cocaine, and a rejection of his duress defense. Additionally, the district court did instruct the jury that "the defendants are only on trial for the particular crime charged in the indictment. Your job is limited to deciding whether the government has proved the charged conspiracy." Dhaliwal suffered no actual prejudice. Accordingly, Dhaliwal is not entitled to a new trial on this ground.

## C. Failure to Grant Baljit's Motion to Sever

Baljit contends that the district court erred in denying his motion to sever his case from that of his co-defendants. Before trial, it became clear that Baljit's co-defendants, Guron and Dhaliwal, would both present a duress defense during trial. Out of fear that Guron's and Dhaliwal's out-of-court statements implicating him in the alleged scheme to coerce them would be presented at trial, Baljit moved to sever his trial from that of Guron's and Dhaliwal's. The district court denied the motion. On appeal, Baljit argues that severance was required to protect his constitutional right to confront the witnesses against him in the event his co-defendants did not testify at trial.[10]

This court reviews a district court's decision to grant or deny a defendant's motion to sever his case from that of his co-defendants for an abuse of discretion. *United States v. Anderson*, 89 F.3d 1306, 1312 (6th Cir. 1996). Federal Rule of Criminal Procedure 14 provides that "[i]f the joinder of offenses or defendants . . . appears to prejudice a defendant or the government, the court may . .

---

[10] Baljit does not contend that he was denied his right to confront the witnesses against him. Instead, Baljit argues that because there was a possibility that Dhaliwal and Guron would not have testified at trial, the district court should have granted his motion to sever. However, both Dhaliwal and Guron testified at trial, allowing Baljit the opportunity for cross-examination. Thus, Baljit's trial rights were not compromised in this respect.

. sever the defendants' trials . . . ." Fed. R. Crim. P. 14(a). "Generally, persons indicted together should be tried together." *United States v. Warner*, 971 F.2d 1189, 1196 (6th Cir. 1992). Severance will be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Antagonistic defenses are not sufficient to warrant severance; the defendant must show that the antagonistic defenses are likely to mislead or confuse the jury. *United States v. Critton*, 43 F.3d 1089, 1098 (6thCir. 1995). A defendant must show substantial, undue, or compelling prejudice to require a severance. *United States v. Lopez*, 309 F.3d 966, 971 (6thCir. 2002).

At trial, Baljit maintained that he was merely an innocent bystander who had flown to Chicago to meet Rajinder regarding a business opportunity. This position was not antagonistic to his co-defendants' duress defenses because Baljit's claim of innocence was not predicated solely on the guilt of Dhaliwal and Guron. *See United States v. Harris*, 9 F.3d 493, 501 (6th Cir. 1993). Here, the jury could have made a determination that Baljit was an innocent bystander and that Guron and Dhaliwal were forced to transport the cocaine. At trial, Dhaliwal did not testify as to Baljit's role in the conspiracy. Guron offered some testimony that he previously identified Baljit as one of the men who approached him in the restroom of the Flying J and said they needed him to do some work for them; however, at trial, Guron did not identify Baljit as one of the men who threatened him in the Flying J restroom.[11] Nevertheless, the attempt of one defendant to save himself by inculpating

---

[11] At trial, Guron identified only "Binda" (Rajinder) as doing so.

another defendant does not require that the defendants be tried separately. *Warner*, 971 F.2d at 1196

(citing *United States v. Davis*, 623 F.2d 188, 194 (1st Cir. 1980)). Furthermore, Baljit was able to

cross-examine Guron as to any statement inculpating him. Baljit has failed to make the strong

showing of prejudice necessary to require severance where the defendants were properly joined.

Accordingly, the district court did not abuse its discretion in denying Baljit's motion to sever.

## D. District Court's Violation of Federal Rule of Criminal Procedure 25(a)

Baljit next claims that he is entitled to a new trial because he was deprived of his right to fair

trial in light of the circumstances surrounding jury deliberations and the district court's violation of

Federal Rule of Criminal Procedure 25(a).

The jury returned guilty verdicts as to Guron and Dhaliwal after a day and a half of

deliberation. Later, while still deliberating as to Baljit, the jury submitted a question regarding the

definition of "conspired" and whether or not there was a possibility of reducing the charge. In

response, the presiding judge, the Hon. Janet Neff, referred the jury to the jury instructions. After

releasing the jury on September 30, 2008, Judge Neff informed the parties that she had "tickets for

Stratford on Thursday and Friday." On October 1, 2008, Judge Neff issued an *Allen* charge to the

jury. At the same time, Judge Neff informed the jury that she would not be there for the rest of the

week and that Judge Gordon Quist would be there in her place to answer any further questions or to

receive the verdict. Later that afternoon, the jury submitted a set of questions to Judge Quist

regarding what they believed to be contradictory instructions, questions not raised in court, and the

use of trial transcripts. After consulting with the parties, Judge Quist followed the approach

requested by Baljit's counsel and answered these questions by referring the jury back to the jury instructions. At the end of the day, the jury returned a guilty verdict as to Baljit.

Rule 25 provides that "[a]ny judge regularly sitting in or assigned to the court may complete a jury trial if . . . the judge before whom the trial began cannot proceed because of death, sickness, or other disability . . . and . . . the judge completing the trial certifies familiarity with the trial record." Fed. R. Crim. P. 25(a)(1)-(2). Baljit contends on appeal that the district court violated Rule 25(a) when it substituted judges because Judge Neff lacked sufficient grounds for substitution before the verdict was returned and because Judge Quist did not certify his familiarity with the trial record. However, even if such a substitution was improper, Baljit is not entitled to a new trial unless he has been prejudiced by the substitution. Fed. R. Crim. P. 52(a) (providing that "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded"); *see United States v. Lane*, 708 F.2d 1394, 1398 (9th Cir. 1983) (holding that appellant had not suffered any prejudice by the improper substitution of judges which required reversal of the conviction).

Baljit contends that he was prejudiced by this improper substitution due to the circumstances surrounding jury deliberations, including: long hours in a hot room, a tired group of people who advised the court they had reached an impasse, numerous questions about the evidence both before them and what they felt was missing, and unclear jury instructions. Specifically, Baljit takes issue with Judge Quist's referring the jury back to the jury instructions in response to the jury's questions. However, Judge Quist followed the approach suggested by Baljit's counsel. In fact, Baljit's counsel stated that he would object to anything other than simply referring them back to what they already heard. Therefore, Baljit cannot show that he was prejudiced in this respect. *See United States v.*

21

*Street*, 614 F.3d 228, 234 (6th Cir. 2010) (a defendant cannot "agree in open court with [the] judge's proposed course of conduct and then charge the court with error in following that course.").

Baljit further contends that he was prejudiced by the message the substitution sent to the jurors–that "the time the jurors were collectively spending deliberating Appellant's guilt or innocence was not as important as whatever took Judge Neff 'out of town for the rest of the week,'" and that "they were to return a verdict as soon as possible or continue to sit together while others moved along with their lives." However, there is no evidence that the jurors knew the reason for the substitution or that the jurors were in any way affected by the substitution. Accordingly, because Baljit was not prejudiced by the substitution of judges, a reversal of his conviction is not warranted.

## E. Insufficiency of Evidence

Baljit contends that the evidence offered at trial was insufficient to support a guilty verdict against him.[12] This court reviews *de novo* a defendant's preserved claim on appeal challenging the sufficiency of the evidence of guilt. *United States v. Tocco*, 200 F.3d 401, 424 (6th Cir. 2002). In reviewing a claim of insufficient evidence, the court reviews the evidence in the light most favorable to the prosecution and determines whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)).

---

[12] Singh preserved this claim for appeal by orally moving the district court at the close of the government's case and at the close of all proofs pursuant to Federal Rule of Criminal Procedure 29.

"Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *Tocco*, 200 F.3d at 424 (internal quotations omitted). "The jury may draw any reasonable inferences from direct, as well as circumstantial, proof." *Id*. To sustain a drug conspiracy conviction under 21 U.S.C. § 846, the government must prove beyond a reasonable doubt that (1) there was an agreement to violate drug laws; (2) the defendant had knowledge of and intent to join the conspiracy; and (3) he participated in the conspiracy. *United States v. Gardner,* 488 F.3d 700, 710 (6th Cir. 2007).

As for the first element, "the government need not prove the existence of a formal or express agreement among the conspirators. Even a tacit or mutual understanding among the conspirators is sufficient." *Id*. (citing *United States v. Avery*, 128 F.3d 966, 970-71 (6th Cir. 1997)). Here, the government put forward sufficient evidence of an agreement to violate the drug laws by transporting cocaine from the United States to Canada. The government presented voluminous phone records showing that the alleged co-conspirators were in constant contact with one another. ICE agents observed and security video showed three duffel bags of cocaine being transferred from Dhaliwal's to Guron's truck. Additionally, Rajinder's testimony provided substantial support for the existence of an agreement, as he testified that Dhaliwal was paid to transport the cocaine to Michigan, where a garbage truck would take the cocaine across the border into Canada.

As to the second and third elements, "the government must show the willful membership of the defendant in the conspiracy . . . ." *Id*. at 711. Although a defendant's connection to the conspiracy need only be slight, mere association with other conspirators is not sufficient to establish participation. *Id*. The government "must prove that [the defendant] was aware of the objects of the

23

conspiracy, and that he voluntarily associated himself with it to further its objectives." *United States v. Gibbs,* 182 F.3d 408, 421 (6th Cir. 1999) (quoting *United States v. Hodges,* 935 F.2d 766, 772 (6th Cir.1991)). The defendant "'need not be an active participant in every phase of the conspiracy, so long as he is a party to the general conspiratorial agreement.'" *Id.* (quoting *Hodges,* 935 F.2d at 773). Finally, a defendant's knowledge of and participation in the conspiracy may be inferred from his actions and reactions to the circumstances. *Gardner,* 488 F.3d at 711.

On appeal, Baljit contends that the only evidence offered against him regarding the element of intent was Rajinder's "incredible testimony." In attacking Rajinder's testimony, Baljit points out that Rajinder is a convicted drug trafficker and trafficker of illegal aliens and that Rajinder lied repeatedly to numerous individuals associated with this case. However, there "is no place . . . for arguments regarding a government witness's lack of credibility . . . ." when reviewing a challenge to the sufficiency of the evidence. *United States v. Adamo*, 742 F.2d 927, 934-35 (6th Cir. 1984). Indeed, "[i]t is [for] jurors and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story." *United States v. Gallo*, 763 F.2d 1504, 1518 (6th Cir. 1985).

Applying these standards, we conclude that there was sufficient evidence to permit a rational juror to find that Baljit was a willing participant in the overarching conspiracy to distribute the cocaine from the United States to Canada. At trial, the government presented evidence that law enforcement officers arrested Baljit at the scene of the traffic stop in Michigan. In the trunk of the silver Cobalt, officers found Baljit's plane ticket and rental receipts for the car. Additionally, Rajinder's and Sandeep's testimony confirmed that Baljit was a part of the plan to steal the cocaine, possibly from the beginning. Rajinder testified that Baljit was to meet him in Gary, Indiana in order

24

to steal the drugs from the green GTX truck. Rajinder and Sandeep both testified that Baljit gave money to Paramjeet to purchase gloves and duct tape in order to tie Dhaliwal's hands together if he came back while they were stealing the cocaine. Additionally, phone records presented by the government show that Baljit exchanged phone calls with Jeswinder on April 28, 2008, immediately before boarding the plane from Seattle to Chicago.

Taking the evidence in a light most favorable to the government, a reasonable juror could conclude that Balit knew of the conspiracy to transport the cocaine to Canada and voluntarily associated himself with that conspiracy by agreeing to steal the cocaine from Dhaliwal in order to place the drugs in Jeswinder's hands. Although Rajinder testified that he did not know what would happen after they placed the stolen cocaine in Jeswinder's truck, the jury could rationally infer that Baljit knew the large quantity of cocaine would be further distributed. Accordingly, there was sufficient evidence to prove that Baljit was a knowing and willful participant in the conspiracy to distribute cocaine. Baljit's challenge to the sufficiency of the evidence therefore is without merit.

### III. CONCLUSION

Having addressed all of Dhaliwal's and Baljit's arguments and finding none of them persuasive for the reasons articulated above, we AFFIRM Dhaliwal's and Baljit's convictions.