NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 15a0090n.06

Case No. 14-5391

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| | | **FILED** |
| | | Jan 28, 2015 |
| | | DEBORAH S. HUNT, Clerk |

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| ARNOLD E. FOX, | ) | TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: BATCHELDER, SUTTON, and COOK, Circuit Judges.

COOK, Circuit Judge. A jury convicted Arnold Fox of using a means of interstate commerce to attempt to persuade, induce, entice, or coerce a fifteen-year-old girl in violation of 18 U.S.C. § 2422(b). Fox appeals, arguing that (1) the evidence presented at trial was insufficient to support his conviction because he did not discuss sexually explicit topics with the minor via text message, (2) the district court abused its discretion by modifying Fox's requested jury instruction regarding "grooming," and (3) the government violated *Brady v. Maryland* by withholding evidence about his victim's character. In separately filed pro se motions, he challenges the constitutionality of § 2422(b) and the Criminal Justice Act, 18 U.S.C. § 3006A. We AFFIRM.

I.

In late 2011, Fox exchanged hundreds of text messages with S.S., a fifteen-year-old girl, before asking her for sex during a face-to-face meeting. They began their correspondence shortly after the Tennessee Department of Child Services removed Fox's daughter, W.F., from his home. On November 16, 2011, S.S. sent a text message to W.F.'s mobile telephone, which W.F. left behind at Fox's house. Fox replied two days later and explained that W.F. was in state custody. On the following day, after exchanging several text messages with S.S. using his daughter's phone, Fox gave her his personal mobile phone number.

Fox asked S.S. about her family, and then confided that he missed his daughter and felt that she did not love him or need him anymore. He offered to take her shopping after she wrote that her family struggled to pay bills, and bought her an iPod, a jacket, pajamas, belts, sweatshirts, jeans, perfumes, lotions, two bras, and a teddy bear. After their trip, he wrote to ask if she was "still all smiles?" and he told her that she was a "pretty, hard working young lady" who "deserved" his gifts. (App'x at 29.) He later wrote "Still smiling? What did everyone think. Happy for u i hope. Next I would like to get you those nice earrings." (App'x at 29.) S.S. replied that her mother was about to call Fox; she asked him to lie and say that Fox's daughter joined them for the shopping trip.

S.S. wrote later to say that she needed more clothing and Fox replied, "We can work on that. No problem. I was just thinking about you." (App'x at 30.) He asked, "What does your boyfriend plan to get you for the holidays." (App'x at 30.) She replied that she didn't have a boyfriend and had recently ended a relationship. He responded, "Oh. Sorry. I just assumed you had one. Your a very pretty girl. You'll get another." (App'x at 30.) He told her that people suspected him of "hurting" his daughter and, while he used to have a girlfriend, "that didn't help

[dispel suspicions] because we werent having….well u know." (App'x at 31.) Fox suggested that it was hard to "be friends" with S.S. because of the "big age difference," adding that "I know that should not matter. But i know it does. Cant just hang out. Only have text and shopping. But thats good too." (App'x at 31.) Later that day, he asked why she ended her relationship with her previous boyfriend. He told her that "i dont feel nor think that i am my age. You are as they say as only as old as you think you are. In that case im a teenager. Lol." (App'x at 33.)

Fox told S.S. that he worried about taking her shopping again because he didn't want her to "get the wrong idea" about him. (App'x at 30.) He added, "Some people would believe that we were doing things and would not understand. A man being with a pretty young teen. All of a sudden buying her real nice things." (App'x at 31.) Nonetheless, he wrote that "[t]he more we talk about it the more i want to take u out shopping" but advised her that he wanted to shop in a different town "for fear of us being seen."[1] (App'x at 32.) He said he "enjoy[ed] [her] company" and wanted to buy her "some nice earrings or something." (App'x at 32.) Later, he told her, "Im stuck on taking you out tonite or waiting a day or two. . . . If i get you everything now. Wont have anything to get you later." (App'x at 33.)

Still, Fox took S.S. shopping the following day. Afterward, he sent her a text message asking if she was happy, acknowledging, "Again i know i ask a lot if you are happy. I know the answer. Its just nice to see you smiling. You do have a VERY nice smile. I like feeling that im doing something for you." (App'x at 34.)

In the meantime, the FBI received an anonymous tip that Fox kept child pornography at his residence. Agents searched Fox's home on November 23, seizing his cell phone and computers. Fox wrote to S.S. later that day using his daughter's phone and said that he needed to

---

[1]Fox and S.S. both resided in Millington, Tennessee.

talk with her. He told her that the FBI took his phone and predicted that agents would "wonder about our friendship . . . [and] think there is more to it." (App'x at 3.)

One day later, Fox repeated his request to meet and told her, "I may [ask] you for a great big favor." (App'x at 4.) He explained that he needed to talk to her in person rather than over the phone because the FBI could access his deleted text messages. Later, he elaborated, "Its a big favor. Too big maybe. But it would make it easier to make up my mind to help you more." (App'x at 4.) He added, "I didnt want to ask. But I don't know anyone else that can do it for me right now. Because u r a good friend. And I believe you would be understanding. Even if you didnt want to help." (App'x at 5.) And he said, "Sorry to be so mysterious. . . . Its about this stuff and what is going to happen to me. You because I don't have anyone to turn too. . . . Its a strange request that i have never had to make before." (App'x at 5.) Later, when she said she had to babysit and could only get away for a short time, he wrote, "I can't say how long our talk will last. . . . I could try to be quick with the favor if you agree . . . I really don't think you will agree though." (App'x at 7.)

S.S. testified that Fox picked her up that night and revealed the favor: he wanted to have intercourse with her because, in S.S.'s words, "he was going to jail for a really long time and he didn't know if he was going to ever get it again." (R. 159, Trial Tr. at 43.) She refused, and he took her home. S.S. later sent a text message in which she threatened to tell her brother and the FBI that Fox propositioned her for sex unless he gave her money. He denied asking her for sex in the message he sent in response. Over the next few weeks, she asked him repeatedly for money to cover various expenses, including her family's rent. Later, after he became suspicious that she was using the money to buy drugs and confronted her about it, she again threatened to report him to the FBI. But S.S. never contacted law enforcement about Fox's conduct. Instead,

she reported his request only when an FBI agent asked her about their relationship after discovering their text messages on Fox's phone.

In September 2013, three months before Fox's trial, the government charged a different Millington resident, Michael Lilley, with running a child prostitution ring out of his home. The indictment named S.S. as one of Lilley's child victims. S.S. allegedly took $1,700 from Lilley, and she and another girl later told a high school counselor about Lilley's activities. The government did not disclose S.S.'s involvement in the Lilley case to Fox's defense team before trial.

A jury convicted Fox of attempted enticement of a minor. After trial, Fox moved for a judgment of acquittal on the ground that the government failed to prove that Fox exposed S.S. to sexually explicit material using his cell phone. He raised the same sufficiency argument in a separate motion for a new trial, and also objected to the court's failure to mention exposure to "sexual material" in its "grooming" instruction to the jury and the government's decision to withhold information about S.S.'s involvement in the Lilley case. The court denied the motions and sentenced Fox to 188 months' imprisonment. Fox timely appealed.

II.

Fox contends that the government failed to put forward sufficient evidence to convict him of attempted enticement of a minor. The relevant statute, 18 U.S.C. § 2422(b), prohibits:

> using . . . any facility or means of interstate . . . commerce . . . [to] knowingly persuade[], induce[], entice[], or coerce[] any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempt[ing] to do so.

18 U.S.C. § 2422(b). We review the district court's denial of Fox's motion for a judgment of acquittal de novo, *United States v. Blanchard*, 618 F.3d 562, 574 (6th Cir. 2010), and we will

affirm if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *United States v. Washington*, 715 F.3d 975, 979 (6th Cir. 2013) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

## A. Attempted Enticement or Coercion

Fox first argues that the government failed to prove that he attempted to entice or coerce S.S. because their text messages never touched on sexually explicit topics. In support of that argument, he cites cases from this circuit and others in which defendants convicted under § 2422(b) initiated sexually explicit online or telephone conversations with individuals they believed to be children. *See, e.g.*, *United States v. Fugit*, 703 F.3d 248, 251 (4th Cir. 2012) (defendant asked eleven-year-old girl about her breasts, genitalia, and underwear during initial online conversation); *United States v. Chambers*, 642 F.3d 588, 590–91 (7th Cir. 2011) (defendant used sexually explicit language, told one "minor" he was masturbating and asked her to do the same, and emailed another "minor" pornographic pictures); *United States v. Brand*, 467 F.3d 179, 203 (2d Cir. 2006) (defendant "continuously steered the [online] conversation in the direction of sexual contact"); *United States v. Patten*, 397 F.3d 1100, 1102 (8th Cir. 2005) (defendant asked about sexual preferences "in graphic detail"); *United States v. Bailey*, 228 F.3d 637, 639 (6th Cir. 2000) (defendant "used graphic language to describe how he wanted to perform oral sex" on minor victims).

That evidence of sexually explicit online or telephone conversations sufficed to convict other defendants under § 2422(b) does not mean that such evidence is *necessary* to prove attempted enticement or coercion. Nothing in § 2422(b) or our precedent required the government to prove that the hundreds of text messages exchanged in this case contained

"explicit sexual overtures" or material in order to convict. *Cf. United States v. Lay*, 583 F.3d 436, 447 (6th Cir. 2009) (explaining that the term "entice" as used in U.S.S.G. § 2G1.3(b)(3) "does not require crude specification of intent").

Here, a rational trier of fact could find that Fox attempted to entice or coerce S.S. to agree to his request for sex by flattering her, building intimacy, creating a sense of obligation, and then linking his generosity to his request for sex. He purchased expensive gifts for her, including an iPod, perfume, and brightly colored bras from Victoria's Secret, and then reminded her of his generosity, asking what others thought about her gifts and if she was "still smiling" and "happy." Later, he broached the topic of relationships, asking if she had a boyfriend and why she ended her previous relationship. Around the same time, he hinted that he and his former girlfriend were not sexually intimate and told S.S. that he felt more like a teenager than an adult. He complimented her appearance, calling her "pretty" and telling her that she had a "VERY nice smile." After building trust and intimacy, Fox told her that he needed to ask her for a "great big favor." He connected his generosity to the as-yet undisclosed favor, explaining "Its a big favor. Too big maybe. But it would make it easier to make up my mind to help you more." Under these circumstances, the government presented evidence sufficient to prove beyond a reasonable doubt that Fox attempted to coerce or entice S.S.

## B. "Use" of a Cell Phone

Whether Fox *used his cell phone* to attempt to entice or coerce S.S. is a related but distinct question. Fox suggests that the government failed to prove such use because he never exchanged sexually explicit text messages with S.S., and the only evidence of sexually explicit conduct is S.S.'s testimony that he asked her for sex in person. Although we have not addressed when a defendant can be said to have "used" a cell phone to coerce or entice a minor, we rejected

Fox's preferred interpretation in a case involving a similarly worded sentencing enhancement. That provision, U.S.S.G. § 2G1.3(b)(3), applies where the offense "involved the use of a computer . . . to persuade, induce, entice, coerce, or facilitate the travel of[] the minor to engage in prohibited sexual conduct." In *United States v. Lay*, 583 F.3d 436 (6th Cir. 2009), we affirmed the district court's application of § 2G1.3(b)(3) to a defendant who met and developed a relationship with his child victim online and only later made explicit sexual overtures over the phone. *Id.* at 439, 443. We explained that:

> [a]lthough Lay did not explicitly propose sexual relations in a computer message, Lay communicated via computer with M.V. for one to two months with the apparent intention of having prohibited sexual relations with M.V. . . . When a predator uses a computer to make friends with a potential victim, the enhancement may apply because the predator is using a computer to entice the minor to engage in prohibited sexual conduct, even if the minor does not yet realize the predator's intent.

*Id.* at 447; *see also United States v. Whalen*, 578 F. App'x 533, 544–45 (6th Cir. 2014) (affirming district's court application of § 2G1.3(b)(3) to defendant who developed a sexual relationship with a minor "offline" and later used instant messaging to convince her to elope with him after she and her family moved away).

For similar reasons, we decline to interpret § 2422(b)'s "use" element to require proof that the defendant sent sexually explicit messages or materials to his victim using a means of interstate commerce. Instead, the government can prove beyond a reasonable doubt that a defendant used a computer, cell phone, or some other means to develop a relationship with a child with the aim of coercing, enticing, persuading, or inducing the child to engage in prohibited sexual activity. *Cf. United States v. Mikowski*, 332 F. App'x 250, 251 n.2 (6th Cir. 2009) (describing the process of "grooming" a child victim for sexual activity under § 2422(b) as "an

adult forming a relationship with a child for the purposes of using the minor for sexual purposes in the future").

Here, a rational jury could find that Fox used cell phones to attempt to coerce or entice S.S. He and S.S. exchanged hundreds of text messages in the days leading up to his request for sex. As described elsewhere in this opinion, Fox used text messaging to remind S.S. of his generosity, compliment her appearance, and ask about her previous boyfriend. Later, Fox began to mention a "big favor" in his messages. Although he avoided making his request explicit, citing the FBI's access to his text messages, a reasonable jury could find that his text messages and his ultimate in-person request were part of the same course of conduct, and that Fox therefore used his cell phone to attempt to entice or coerce S.S.

III.

Fox also challenges the district court's instruction to the jury regarding "grooming." "Grooming" is not an element of child enticement under § 2422(b), and it appears nowhere in the Sixth Circuit's Model Jury Instructions. *See Sixth Circuit Criminal Pattern Jury Instruction § 16.09 and Commentary*. Instead, courts have used the term to describe a variety of behaviors that appear calculated to prepare a child for a future sexual encounter. *See United States v. Gonyers*, 761 F.3d 157, 167 (1st Cir. 2014) (taking minor on a trip, buying him gifts, and permitting him to smoke cigarettes); *United States v. Lee*, 603 F.3d 904, 915 (11th Cir. 2010) (sending graphic photographs and promising gifts); *United States v. Brand*, 467 F.3d 179, 203 (2d Cir. 2006) (sharing pictures, flirting, and attempting to gain affection).

Fox's proposed instruction relied on a Seventh Circuit case defining "grooming" as "deliberate actions taken by a defendant to expose a child to sexual material." *United States v. Chambers*, 642 F.3d 588, 593 (7th Cir. 2011). He requested that the court instruct the jury that:

> Grooming refers to deliberate actions taken by a defendant to expose a child to sexual material; the ultimate goal of grooming is the formation of an emotional connection with the child and a reduction of the child's inhibitions in order to prepare the child for sexual activity. Such actions can include sharing pornographic pictures, flirting, and attempting to gain affection and other such actions and words containing explicit sexual overtures.

(R. 108, Def.'s Proposed Jury Instructions at 15.) The court adopted much of Fox's proposed instruction but changed "sexual material" to "sexual activity" and omitted the examples of "grooming" activities culled from other circuits' case law. Thus, the jury heard that "grooming refers to the deliberate actions taken by a defendant to expose a child to sexual activity" and "[t]he ultimate goal of grooming is the formation of an emotional connection with the child and the reduction of the child['s] inhibitions in order to prepare the child for sexual activity." (R. 160, Trial Tr. at 351.)

On appeal, Fox contends that the district court's changes to his proposed instruction prejudiced his defense. We cannot agree. Given that "grooming" encompasses a wide swath of behavior and courts have not settled on a single definition of the term, the district court acted within its discretion in modifying the Seventh Circuit's definition and declining to list examples for the jury. *See United States v. Gunter*, 551 F.3d 472, 484 (6th Cir. 2009). And, viewed as a whole, the court's § 2422(b) instruction "adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision." *United States v. Edington*, 526 F. App'x 584, 589–90 (6th Cir. 2013).

IV.

Finally, Fox argues that the government violated *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding information about S.S.'s involvement in Michael Lilley's sex trafficking case. He contends that S.S.'s conduct in the Lilley case undermines the credibility of her allegations

against Fox. According to Fox, evidence that S.S. took $1,700 from Lilley and then reported Lilley's activities a few months later particularly damages her credibility because it shows that S.S. engaged in a pattern of "taking money from men, and then later running to the government claiming sexual crimes had been committed against her." This circuit has yet to decide the appropriate standard for reviewing a district court's denial of a motion for a new trial premised on a *Brady* violation. *See United States v. Douglas*, 634 F.3d 852, 860 (6th Cir. 2011) (citing *United States v. Heriot*, 496 F.3d 601, 605 (6th Cir. 2007)) (explaining that courts apply either abuse of discretion or de novo review). We need not decide which standard applies, because Fox's *Brady* claim fails even under the less-deferential de novo standard.

As a threshold matter, we must decide whether *Brady* mandates disclosure of *any* evidence relating to S.S.'s involvement in the Lilley case. *See United States v. Ogden*, 685 F.3d 600, 605 (6th Cir. 2012) (explaining that *Brady* applies only to evidence admissible at trial or that would lead to other, admissible evidence). Under Federal Rule of Evidence 412, a court may not admit evidence of a sex-crime victim's sexual conduct or predisposition unless excluding it would violate the defendant's constitutional right to present a full defense. In general, excluding evidence violates a defendant's constitutional rights if such evidence is "central to the defendant's claim of innocence" and the state lacks any valid justification to exclude it. *See Gagne v. Booker*, 680 F.3d 493, 514 (6th Cir. 2012) (en banc) (citing *Crane v. Kentucky*, 476 U.S. 683, 690–91 (1986)). Here, the government had a valid interest in protecting the privacy of a minor who reported sexual abuse, *see Ogden*, 685 F.3d at 606, and S.S.'s involvement in the Lilley case was, at most, marginally relevant to Fox's defense.[2] That S.S. fell

---

[2]Alternatively, the district court would have been justified in excluding such evidence on the ground that it was likely to confuse or mislead the jury. *See* Fed. R. Evid. 403, 611;

victim to Lilley's sex-trafficking scheme over a year after Fox propositioned her has no relevance to whether Fox attempted to entice her or whether she told the truth in Fox's case. *See United States v. Elbert*, 561 F.3d 771, 777–78 (8th Cir. 2009) (noting that a victim's sexual conduct cannot be used to impeach his or her credibility).

And, even if *Brady* required the government to disclose that S.S. took money from Lilley, Fox cannot show prejudice, because S.S.'s alleged theft was not "material" to his defense. *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Although impeachment evidence is generally material under *Brady*, *see United States v. Dhaliwal*, 464 F. App'x 498, 505 (6th Cir. 2012), undisclosed evidence that "merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable . . . may be cumulative, and hence not material." *Jefferson v. United States*, 730 F.3d 537, 550 (6th Cir. 2013) (quoting *Byrd v. Collins*, 209 F.3d 486, 518 (6th Cir. 2000)).

Here, evidence that S.S. either took or stole $1,700 from Lilley would have been cumulative of substantial evidence tending to undermine S.S.'s credibility. S.S. testified on direct examination that she used Fox's request for sex to her advantage by continuing to ask him

---

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Fox's theory that S.S. had a "modus operandi" of stealing or extorting money from men and then accusing them of sex crimes implicates a number of collateral issues, including whether the $1,700 belonged to Lilley or to Lilley's victims, and whether S.S.'s allegations against Lilley have merit.

for money. On cross-examination, she admitted that she lied to Fox numerous times about why she needed money. *See* R. 159, Trial Tr. at 178 (asked for $20 to visit her aunt in Mississippi); *id.* at 179–80 (asked for money to help her mother pay bills); *id.* at 184 (lied about spending $60 she received from Fox on groceries for her family); *id.* at 187–89 (lied about her family's danger of eviction in order to get money); *id.* at 189 (lied about when her family's rent check was due). She also admitted that she lied to Fox when she told him that her mother knew that he gave her money and bought her gifts. *See* R. 159, Trial Tr. at 182 (lied about telling her mother that Fox gave her money); *id.* at 184 (lied about whether her mother knew about the full extent of their relationship and approved of it); *id.* at 186 (lied about showing her mother all of Fox's gifts). In light of all of that evidence tending to undermine S.S.'s credibility, any further damage to her credibility from admitting that she either took or stole $1,700 from Lilley would not have changed the outcome of the case. *See Strickler*, 527 U.S. at 281–82.

V.

In addition to the arguments raised through counsel, Fox also moves pro se to certify the constitutional questions of whether 18 U.S.C. § 2422(b) exceeds Congress's power to regulate interstate commerce and whether the scheme for funding indigent defense under 18 U.S.C. § 3006A comports with due process. Because Fox is represented by counsel on appeal, we decline to address his pro se constitutional challenges. *See United States v. Williams*, 641 F.3d 758, 770 (6th Cir. 2011).

VI.

For those reasons, we AFFIRM the district court's judgment and DENY Fox's pro se motions to certify.