NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0638n.06

Nos. 15-1963, 15-1966, 15-1998, 15-2064, 15-2065, 15-2089

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| MARVIN NICHOLSON; BRIAN JACKSON; | ) | COURT FOR THE EASTERN |
| SHERMAN BROWN; MATTHEW SCHAMANTE; | ) | DISTRICT OF MICHIGAN |
| BRYAN SORRELL; ANTONIO JOHNSON, | ) | |
| | ) | |
| Defendants-Appellants. | | |

**FILED**
Nov 17, 2017
DEBORAH S. HUNT, Clerk

BEFORE: GIBBONS, COOK, and THAPAR, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. This consolidated appeal arises from the convictions of six members of the Phantom Motorcycle Club ("PMC"): Marvin Nicholson, Antonio Johnson, Bryan Sorrell, Matthew Schamante, Brian Jackson, and Sherman Brown.

The government brought various charges against these six appellants and others[1] in a fifteen-count indictment. After a six-week trial, the jury convicted these defendants of:

- Nicholson – RICO Conspiracy, 18 U.S.C. § 1962(d); Assault with a Dangerous Weapon in Aid of Racketeering, 18 U.S.C. § 1959(a)(3); Conspiracy to Assault with a Dangerous Weapon in Aid of Racketeering, 18 U.S.C. § 1959(a)(6); two counts of Use and Carry of a Firearm During, and in Relation to, a Crime of Violence, 18 U.S.C. § 924(c); Conspiracy to Commit Murder in Aid of Racketeering, 18 U.S.C. § 1959(a)(5); Assaulting, Resisting, or Impeding Certain Officers or Employees with a Dangerous Weapon, 18 U.S.C. § 111(b); two counts of Felon in Possession of a Firearm, 18 U.S.C. § 922(g)(1).

---

[1] Two of the individuals charged in the indictment, Christopher Odum and William Frazier, are also before this court on appeal. In the district court, proceedings against Frazier and Odum were severed, and the case against them proceeded separately. The cases were also initially consolidated on appeal, but this court granted Frazier and Odum's motion to separate cases for oral argument.

- Johnson – RICO Conspiracy, 18 U.S.C. § 1962(d); Assault with a Dangerous Weapon in Aid of Racketeering, 18 U.S.C. § 1959(a)(3); Conspiracy to Assault with a Dangerous Weapon in Aid of Racketeering, 18 U.S.C. § 1959(a)(6); Use and Carry of a Firearm During, and in Relation to, a Crime of Violence, 18 U.S.C. § 924(c); Conspiracy to Commit Murder in Aid of Racketeering, 18 U.S.C. § 1959(a)(5); Felon in Possession of a Firearm, 18 U.S.C. § 922(g)(1).

- Sorrell – RICO Conspiracy, 18 U.S.C. § 1962(d); Assault with a Dangerous Weapon in Aid of Racketeering, 18 U.S.C. § 1959(a)(3); Conspiracy to Assault with a Dangerous Weapon in Aid of Racketeering, 18 U.S.C. § 1959(a)(6); Use and Carry of a Firearm During, and in Relation to, a Crime of Violence, 18 U.S.C. § 924(c); Conspiracy to Commit Murder in Aid of Racketeering, 18 U.S.C. § 1959(a)(5).

- Schamante – RICO Conspiracy, 18 U.S.C. § 1962(d); Possession of a Firearm Not Registered in the National Firearms Registration, 26 U.S.C. §§ 5841, 5861(d), 5871.

- Jackson – Conspiracy to Commit Murder in Aid of Racketeering, 18 U.S.C. § 1959(a)(5).

- Brown – Conspiracy to Commit Murder in Aid of Racketeering, 18 U.S.C. § 1959(a)(5).

The appellants now challenge numerous aspects of the trial and sentencing. We affirm the trial court.

## I.

The charges and convictions in this case stem from a series of PMC confrontations with rival motorcycle clubs. PMC is an "outlaw" motorcycle club that has chapters in Michigan, Ohio, and six other states. The Detroit chapter is the "mother chapter." PMC has a hierarchical structure, with a national president, vice-president, enforcers, and treasurer. Each chapter also has a chapter president and vice-president. PMC has a set of by-laws, members are required to pay dues, and chapters pay money to the national treasurer.

PMC places high value on being the toughest, or "baddest," outlaw motorcycle club. One way to establish this dominance is to take the leather vests worn by members of rival clubs (known as "rags"), which are important symbols in motorcycle club culture. This is considered the ultimate sign of disrespect. PMC members are not allowed to let rivals take their own rags,

and they must resist with force or use violence to get them back. PMC's rival motorcycle clubs in the Detroit area include Hell Lovers and Satan's Sidekicks.

Johnson served as PMC's national president from 2009 until his indictment in this case. Nicholson was a national enforcer, whose job it was to protect the national president. Brown was formerly a national enforcer, but at the time of the indictment he no longer held a national role. Sorrell and Jackson were both members of the Inkster, Michigan, chapter of PMC. Schamante was vice president and then president of the Pontiac, Michigan, chapter.

Carl Miller, who gave extensive testimony as a government witness in this case, joined PMC in 2007 and then became president of the Detroit chapter in 2012. After he was arrested helping Sorrell steal a motorcycle in 2013, Miller began to cooperate with the ATF and FBI investigation of PMC. Miller began recording his conversations with other PMC members, and many of these recordings were introduced at trial.

## II.

The defendants first challenge the district court's denial of their motions for acquittal based on insufficient evidence on several counts. The district court's denial of a motion for judgment of acquittal is reviewed *de novo*. *See United States v. Vichitvongsa*, 819 F.3d 260, 270 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 79 (2016). In assessing the sufficiency of the evidence, the test is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." *United States v. Lowe*, 795 F.3d 519, 522–23 (6th Cir. 2015) (quoting *United States v. Algee*, 599 F.3d 506, 512 (6th Cir. 2010)). This standard imposes "a

very heavy burden" on defendants. *United States v. Barnes*, 822 F.3d 914, 919 (6th Cir. 2016) (quoting *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006)). We find that each conviction is supported by sufficient evidence.

## A.

Johnson, Nicholson, Sorrell, and Schamante first challenge the sufficiency of evidence with regards to their RICO conspiracy convictions under 18 U.S.C. § 1962(d). To be convicted of RICO conspiracy, a defendant must intend to further an endeavor that, if completed, would satisfy all elements of a RICO offense. *Salinas v. United States*, 522 U.S. 52, 65 (1997); *United States v. Fowler*, 535 F.3d 408, 421 (6th Cir. 2008). Defendants were charged with conspiring to violate § 1962(c). Therefore, to sustain these convictions, the government must have shown that each defendant agreed (1) to associate with an enterprise that has activities affecting interstate commerce; (2) to participate in the conduct of the enterprise's affairs; and (3) that either he or another conspirator would engage in a pattern of racketeering activity. *See Fowler*, 535 F.3d at 418; *see also* 18 U.S.C. § 1962(c)–(d).

## 1.

Defendants first claim that the government failed to show at trial that PMC is an enterprise. 18 U.S.C. § 1961(4) defines "enterprise" for RICO purposes as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact . . . ." Here, the government alleged an association-in-fact enterprise. An association-in-fact enterprise requires only three structural features: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009).

4

At trial, the prosecution presented ample evidence that PMC had the required purpose, relationships, and longevity to qualify as an enterprise. The government showed that PMC's purpose was to promote and protect the organization's "power, territory, and reputation . . . through the use of intimidation [and] violence" by introducing testimony outlining the importance to PMC of earning respect as the "baddest" motorcycle club. DE 201, Third Superseding Indictment, Page ID 1664. It also demonstrated that PMC had the purpose of enhancing its members' money-making activities, including trafficking in stolen motorcycles, by showing that Phantoms assisted each other in stealing motorcycles and transporting them across state lines. For example, Phantoms would alert each other when a member had stolen a motorcycle, and a Phantom would be assigned to teach new members how to steal motorcycles. The required relationships were evidenced by testimony regarding PMC's by-laws, its hierarchical chain of command, and the process for becoming a PMC member. Finally, in addition to testimony from multiple witnesses who had been members of PMC for several years, the government introduced evidence that PMC has existed since 1968, demonstrating longevity. Based on this, a rational juror could conclude that PMC was an association-in-fact enterprise.

Sorrell and Schamante also argue that PMC's activities did not affect interstate commerce. To meet RICO's "affecting interstate commerce" requirement, the government need only prove that the enterprise as a whole engaged in interstate commerce or that its activity affected interstate commerce. *See United States v. Qaoud*, 777 F.2d 1105, 1116 (6th Cir. 1985) (noting that it is the conduct of the "criminal enterprise itself," rather than the "individual defendant," that must affect interstate commerce). If an enterprise engages in economic activity, then even a *de minimis* connection to interstate commerce is sufficient to meet the interstate requirement; however, if an enterprise does not engage in economic activity, then it must have a

more significant effect on interstate commerce. *See Waucaush v. United States*, 380 F.3d 251, 255–56 (6th Cir. 2004).

At trial, the jury heard extensive testimony regarding PMC's interstate economic activities, such as paying money toward a national fund and transporting stolen motorcycles across state lines. Testimony also evidenced members' use of hotels during PMC gatherings. Thus, a jury could rationally conclude from the evidence that PMC was either directly engaged in or substantially affected interstate commerce. *See United States v. Donovan*, 539 F. App'x 648, 660–61 (6th Cir. 2013).

2.

Schamante next asserts that there was insufficient evidence that he was associated with the PMC enterprise. He concedes, however, that he served as the vice president and then president of his chapter. This leadership role more than satisfies RICO's loose association requirement. *See United States v. Delgado*, 401 F.3d 290, 297 (5th Cir. 2005) (finding association because defendant "personally testified that he was a member" of the enterprise); *United States v. Marino*, 277 F.3d 11, 33 (1st Cir. 2002) ("Association may be by means of an informal or loose relationship."); *United States v. Parise*, 159 F.3d 790, 796 (3d Cir. 1998) ("For the purposes of RICO, the threshold showing of 'association' is not difficult to establish: it is satisfied by proof that the defendant was aware of at least the general existence of the enterprise named in the indictment." (citation and internal quotation marks omitted)).

Schamante and Sorrell each also argue that they did not participate in the affairs of the PMC enterprise. The RICO participation prong is met when the defendant had "*some* part in directing the enterprise's affairs," which "can be accomplished either by making decisions on behalf of the enterprise or by knowingly carrying them out." *Fowler*, 535 F.3d at 418 (citing

*Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993)); *see also Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 793 (6th Cir. 2012) (knowingly carrying out the orders of an enterprise satisfies the *Reves* test). The jury heard testimony that Sorrell shot Satan's Sidekick member Leon McGee after PMC president Johnson instructed PMC members to take Satan's Sidekicks' rags and that Schamante participated in the fight at a Hell Lovers' party on Johnson's orders and periodically supplied guns to other Phantoms. Moreover, Schamante acknowledged that he served in leadership roles within PMC. Based on this evidence, a rational jury could certainly find that Schamante and Sorrell participated in PMC's affairs.

3.

Appellants next allege that the government did not present sufficient evidence of a pattern of racketeering to sustain their convictions. A pattern of racketeering activity requires at least two predicate acts of racketeering related to the enterprise that amount to continued criminal activity. 18 U.S.C. § 1961(5); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989); *United States v. Corrado*, 227 F.3d 543, 554 (6th Cir. 2000) (outlining the "relationship plus continuity" test). These predicate acts do not need to be directly interrelated to establish the required relationship, so long as they are connected to the enterprise's affairs and operations. *United States v. Lawson*, 535 F.3d 434, 444 (6th Cir. 2008); *see also H.J. Inc.*, 492 U.S. at 240. Continuity can be shown by a series of related predicate acts occurring over an extended period of time. *See H.J. Inc.*, 492 U.S. at 241–42; *Vild v. Visconsi*, 956 F.2d 560, 569 (6th Cir. 1992).

At trial, the prosecution introduced evidence related to PMC acts of violence and intimidation between 2009 and 2013. The jury heard evidence of armed PMC members traveling from Michigan to Cleveland, Ohio, to intimidate a rival motorcycle club, the Zulus, into permitting PMC to establish a chapter in Cleveland in 2009. Additional testimony described

armed Phantoms taking the rags from leaders of the Omens motorcycle club in 2010, taking the Black Bottoms motorcycle club's rags in 2013, and taking Hell Lovers' rags in Kentucky in 2013. There was also extensive testimony showing that PMC members raided a Hell Lovers "bridge-the-gap" party in 2013 and that president Johnson instructed members to "tear the party up, act as Phantoms." Then, in September 2013, after Sidekicks disrespected Johnson, armed PMC members went on a mission to take Sidekicks' rags by force. After spotting Sidekick Leon McGee leaving another club's clubhouse, the Phantoms attacked, and Sorrell shot McGee. The prosecution also introduced evidence of a PMC conspiracy to murder members of the rival Hell Lovers motorcycle club in retaliation for a Phantom's death, though this plan was disrupted when the ATF and FBI executed search warrants on Nicholson's, Johnson's, and another Phantom's homes in October 2013.

Because a rational jury could conclude that these predicate acts, which extended across several years, related to the enterprise's affairs and operations, there was sufficient evidence that a pattern of racketeering activity existed.

4.

Johnson, Nicholson, Sorrell, and Schamante next allege that the government did not establish their participation in the "pattern of racketeering activity" required for a RICO conspiracy conviction. However, unlike a § 1962(c) substantive RICO violation, to prove RICO *conspiracy*, the prosecution is not required to show that a defendant actually committed a racketeering act or any overt act at all. *Salinas*, 522 U.S. at 65 ("The interplay between subsections [§ 1962](c) and (d) does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense."); *United States v. Corrado*, 286 F.3d 934, 937 (6th Cir.

8

2002) ("Unlike the general conspiracy statute, § 1962(d) requires no 'overt or specific act' in carrying the RICO enterprise forward."). Instead, a RICO conspiracy conviction can be sustained if a defendant agreed that either he or someone else would commit at least two RICO predicate acts. *United States v. Driver*, 535 F.3d 424, 432 (6th Cir. 2008); *United States v. Saadey*, 393 F.3d 669, 676 (6th Cir. 2005). This agreement does not have to be overt and may be inferred from a defendant's acts. *United States v. Hughes*, 895 F.2d 1135, 1141 (6th Cir. 1990); *Fowler*, 535 F.3d at 420–21.

The prosecution introduced sufficient evidence that Johnson, Nicholson, Sorrell, and Schamante were involved in a conspiracy with other Phantoms that included an agreement to commit at least two predicate acts. The evidence at trial showed that Johnson served as PMC national president beginning in 2009, ordered the confrontation in Cleveland with the Zulus in 2009, the Omens in 2010, the Satan's Sidekicks in 2013 (which led to the shooting of Leon McGee), and directed the plot to murder Hell Lovers. Nicholson served as a national enforcer and participated in the raid on the Zulus, the hunt for Sidekicks that led to the McGee shooting, and the plot to murder Hell Lovers. Sorrell participated in the raid on the Black Bottoms, was present at the bridge-the-gap party, shot McGee, and participated in the plot to murder Hell Lovers. Schamante served as president and vice president of the PMC Pontiac chapter, was present at the bridge-the-gap party, and periodically provided guns to PMC members— sometimes with obliterated serial numbers.

Thus, even though it is not required for a RICO conspiracy conviction, these defendants were directly involved in many of the RICO predicate acts. A rational jury could find that each defendant agreed that either he or someone else would commit at least two RICO predicate acts.

Having failed to demonstrate insufficient evidence for any of the prongs of RICO conspiracy, we find that there is sufficient evidence to sustain each appellant's RICO conspiracy conviction.

B.

Johnson, Nicholson, Sorrell, Brown, and Jackson next assert that insufficient evidence exists to sustain their convictions for Violent Crimes in Aid of Racketeering ("VICAR"), 18 U.S.C. § 1959(a).  We hold the evidence is sufficient.

18 U.S.C. § 1959(a) prohibits committing or conspiring to commit certain violent crimes, including murder and assault with a dangerous weapon, "for the purpose of gaining entrance to or maintaining or increasing [one's] position in an enterprise engaged in racketeering activity . . . ."  "Racketeering activity" and "enterprise" are given the same definitions as in RICO.[2]  Therefore, the evidence discussed above related to the RICO charges establishes that the government presented sufficient evidence that PMC is an enterprise affecting interstate commerce engaged in racketeering activity for VICAR purposes.  We now assess whether there is sufficient evidence of the predicate crimes of violence and whether the defendants committed these crimes to "maintain or increase" their positions in the PMC enterprise.  We conclude that there is and that they did.

1.

A VICAR conviction requires that the government prove the defendant committed the predicate crime of violence.  The defendants here were convicted of violent crimes related to two primary incidents: the shooting of Leon McGee and the conspiracy to murder Hell Lovers.

---

[2] The only difference is that the interstate commerce requirement in RICO is found in the statute's substantive provision, while in VICAR it is in the definition of "enterprise."  *Compare* 18 U.S.C. § 1962(c), *with* 18 U.S.C. § 1959(b)(2).

a.

In September 2013, after members of Satan's Sidekicks disrespected Johnson, Johnson instructed PMC members to take Sidekicks' rags by force. PMC members gathered at the PMC clubhouse (Nicholson, Jackson, Sorrell, and Brown were all present) and from there left to track down Sidekicks. Although the mission was to steal rags, several Phantoms, including Sorrell, were armed, and at one point Nicholson asked Miller whether everyone was armed, and Miller responded that Brown was bringing his gun. Nicholson, Sorrell, and Brown, along with other PMC members, staked out a rival's clubhouse, and when Leon McGee emerged, Sorrell and another Phantom attacked. Sorrell punched McGee, and McGee stabbed Sorrell, at which point Sorrell shot McGee.

Johnson, Nicholson, and Sorrell were convicted of assault with a dangerous weapon in aid of racketeering and conspiracy to assault with a dangerous weapon in aid of racketeering, or aiding and abetting those offenses, related to the shooting of Leon McGee. The court instructed the jury on direct liability, aiding and abetting liability, and *Pinkerton* liability. 18 U.S.C. § 2. A defendant is guilty of aiding and abetting when he "takes an affirmative act in furtherance" of an offense "with the intent of facilitating the offense's commission." *Rosemond v. United States*, 134 S. Ct. 1240, 1245 (2014). This is true "even if that aid relates to only one (or some) of a crime's phases or elements." *Id.* at 1247. Under *Pinkerton*, all members of a conspiracy are responsible for the acts committed by the other members in advancement of the conspiracy, so long as they are reasonably foreseeable. *Pinkerton v. United States*, 328 U.S. 640, 646–48 (1946).

Johnson claims that the evidence is insufficient to sustain his VICAR conviction because he only ordered Phantoms to strip Sidekicks of their rags—not to shoot anyone. However, a jury

could conclude that Johnson's instruction "facilitat[ed] the offense's commission" and that escalation to violence was reasonably foreseeable. *See Rosemond*, 134 S. Ct. at 1245, 1248. Similarly, Nicholson attended the PMC meeting before the assault on McGee, specifically asked whether Phantoms brought guns, and was present at the scene of the shooting. Finally, Sorrell was present at the meeting and actually shot Leon McGee. From this evidence, a rational jury could conclude that defendants were guilty of assault with a dangerous weapon in aid of racketeering and infer a conspiracy to do the same.

b.

All defendants except Schamante were convicted of conspiracy to commit murder in aid of racketeering related to the PMC plot to murder Hell Lovers. After PMC member Steven Caldwell was murdered while riding his motorcycle in late September 2013, PMC president Johnson held a meeting in which he called for retaliation against Hell Lovers—the suspected culprits. At the meeting—with Nicholson, Sorrell, Jackson, and Brown all in attendance—Johnson announced a plan to murder three Hell Lovers, which would cause other Hell Lovers to travel to Michigan for the funerals, at which time PMC would attack and kill a large number of them. Nicholson dispensed orders to PMC members to carry out the first murder, and Nicholson and other PMC members began preparations. Nicholson's and Johnson's direct involvement in the conspiracy easily meet the sufficiency standard.

Additionally, Sorrell, Brown, and Jackson all attended the planning meeting and individually made comments indicating agreement with the plot to kill Hell Lovers. In a recorded conversation with government informant Miller, Sorrell referenced Johnson's plan to attack Hell Lovers and stated that that he was "waiting for the phone call" and that he was

"itching" to retaliate.[3]  DE 740, Gov't Ex. 28A, Page ID 11227–28; DE 740, Gov't Ex. 28B, Page ID 11230.  In another recording, Brown said to Miller that PMC should "[h]it em hard as hell," which Miller testified to at trial as referring to killing Hell Lovers.  DE 711, Gov't Ex. 43F, Page ID 9483.  And in a conversation with Miller, Jackson recounted Johnson's announced plan and said that Slowpoke, the Hell Lover believed to have killed Caldwell, "gotta get it."  DE 740, Gov't Ex. 36A, Page ID 11260.  Thus, a rational jury could have found that Sorrell, Brown, and Jackson participated in the conspiracy.

2.

Sorrell and Jackson further argue that the government did not present sufficient evidence that they committed these predicate crimes "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity," as required by the VICAR statute.  18 U.S.C. § 1959(a).  This court has explained that "VICAR's 'purpose' element is met if the jury could find that an 'animating purpose' of the defendant's action was to maintain or increase his position in the racketeering enterprise."  *United States v. Hackett*, 762 F.3d 493, 500 (6th Cir. 2014).  Thus, increasing his position within PMC need not have been each defendant's sole or even primary motivation.

A rational jury could find that this standard was met for each defendant.  As for Sorrell, at trial the government introduced evidence outlining the importance to PMC of maintaining its reputation as the "baddest" biker gang and that stealing rags—the original mission that led to the McGee assault—is how it maintains that reputation.  *See Hackett*, 762 F.3d at 500 (finding sufficient evidence of VICAR "purpose" even when defendant arguably could have acted in self-

---

[3] Sorrell also argues that this is insufficient evidence of conspiracy because he cannot conspire with a government informant, and these conversations were with Miller only.  *See United States v. Deitz*, 577 F.3d 672, 681 (6th Cir. 2009).  Although the recorded conversations were with Miller, from this evidence a rational jury could conclude that Sorrell had agreed with other PMC members, particularly Johnson, about the object of the conspiracy.

defense). As for Jackson, the plot to murder Hell Lovers was hatched in retaliation for the murder of a PMC member, and Jackson acknowledged that Phantoms were expected to retaliate against anyone who disrespected them. *See United States v. Gills*, No. 15-1613, 2017 WL 3328036, at *3 (6th Cir. Aug. 4, 2017) (stating that a rational jury could find that defendant acted to preserve standing in a gang because the gang "expected its members to retaliate violently when someone disrespected or threatened a fellow member"). A rational jury could have concluded that this expectation motivated Jackson's participation in the conspiracy.

C.

Johnson, Nicholson, and Sorrell next challenge their convictions under 18 U.S.C. § 924(c) for using or carrying a firearm during and in relation to a crime of violence, or aiding and abetting that offense, related to the McGee shooting. To be convicted of violating § 924(c) under an aiding and abetting theory, a defendant must have advance knowledge that the plan would include a firearm. *Rosemond*, 134 S. Ct. at 1249. This advance-knowledge requirement does not mean that a defendant must know in advance that his confederate will *actually use* the gun. Instead, the government must show that the defendant "decided to join in the criminal venture . . . with full awareness of its scope . . . including its use of a firearm." *United States v. Johnson*, No. 16-2063, 2017 WL 3263744, at *8 (6th Cir. Aug. 1, 2017) (quoting *Rosemond*, 134 S. Ct. at 1249).

Sorrell, Nicholson, and Johnson each argue that they did not have this requisite advance knowledge because the McGee incident was not supposed to involve a gun fight, and instead Phantoms were only supposed to steal Sidekicks' rags. We disagree. First of all, there is overwhelming evidence—including Sorrell's own statements caught on recording—that Sorrell actually shot McGee. Thus, there is no reason to even rely on aiding and abetting liability for

Sorrell. Second, before the assault, Nicholson asked Miller whether other PMC members were carrying weapons, and as a result knew that at least one Phantom would be bringing his gun. Lastly, the government presented evidence at trial that prior raids ordered by Johnson included firearms and that Johnson was aware that PMC members usually carried firearms on such raids. *See United States v. Soto*, 794 F.3d 635, 662 (6th Cir. 2015). Viewing the evidence in the light most favorable to the government, a rational jury could thus conclude that Johnson knew in advance that the raid on Sidekicks would include firearms. *See Johnson*, No. 16-2063, 2017 WL 3263744, at *8. There was sufficient evidence presented at trial to sustain each defendant's § 924(c) conviction.

D.

Johnson next argues that there is insufficient evidence to sustain his conviction of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). This conviction was based on two pistols found by ATF agents executing a search warrant on a home with which Johnson was associated. The evidence is sufficient to sustain this conviction.

The possession element of § 922(g)(1) can be satisfied by showing constructive possession, which exists if an individual "knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Walker*, 734 F.3d 451, 455 (6th Cir. 2013) (quoting *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir.1973)). Constructive possession may be proven by circumstantial evidence, and it is not necessary that the defendant have exclusive possession. *Id.*; *United States v. White*, 679 F. App'x 426, 434 (6th Cir. 2017). Instead, "[p]roof that the person has dominion over the premises where the firearm is located is sufficient." *White*, 679 F. App'x at 434 (quoting *United States v. Kincaide*, 145 F.3d 771, 782 (6th Cir. 1998)) (internal quotation marks omitted).

Here, the government introduced significant circumstantial evidence linking Johnson to these guns. Prior surveillance had revealed Johnson at the home, and in executing the warrant, agents seized documents indicating that Johnson owned the home.[4] The pistols were found in a closet that also held a Phantom vest with "President" on it. And in a recorded phone call, Johnson expressed relief that he had not been at the house at the time of the search because "they would've pulled two pistols out the house. . . . [T]hey would've had me." DE 740, Gov't Ex. 48C, Page ID 11289. Drawing inferences in favor of the government, a rational juror could find that Johnson constructively possessed the firearms.

E.

Nicholson challenges his conviction for assaulting and resisting a federal officer with a dangerous weapon in violation of 18 U.S.C. § 111(b) and the associated firearm violation under 18 U.S.C. § 924(c) for firing shots on ATF agents who were executing a search warrant at his house on October 4, 2013. Nicholson claims he did not know the people he fired on were federal agents. However, § 111(b) does not require that the defendant know the person he is assaulting is a federal officer—it just requires an intent to assault. *United States v. Feola*, 420 U.S. 671, 684 (1975) ("All [§ 111] requires is an intent to assault, not an intent to assault a federal officer."); *United States v. Plummer*, 789 F.2d 435, 437 (6th Cir. 1986). Moreover, the search teams used vehicles with flashing police lights, and agents knocked and announced their presence repeatedly before breaching Nicholson's front door. There is sufficient evidence to sustain this conviction.

---

[4] It was, however, later determined that Johnson had quitclaimed his interest in the property to his girlfriend in 2010.

III.

Brown, Jackson, Schamante, and Sorrell argue that the district court erroneously denied their constitutional fair-cross-section challenge to the jury venire. We hold that it did not.

During the second day of voir dire, the defendants challenged the composition of the jury venire as unrepresentative of the number of African-Americans in the district's Detroit Division. Although the defendants had access to juror questionnaires indicating each prospective juror's racial and ethnic background for over a month, defense counsel made the motion only after observing that just three African Americans remained in the jury pool of 100 potential jurors. Citing a court rule, the district court told defendants that their motion should be referred to the Chief Judge of the Eastern District of Michigan[5] and instructed defendants to proceed with that motion separately. Two weeks later, the defendants filed a motion alleging systematic underrepresentation and requesting disclosure of jury wheel materials, which was referred to the Chief Judge. In the interim between the defendants' oral motion during voir dire and the filing of the written motions with the Chief Judge, jury selection was completed, and the jury was sworn in.

Upon referral, the Chief Judge denied the defendants' oral motion during voir dire as untimely under Federal Rule of Criminal Procedure 12(b)(3), which requires challenges to the composition of the jury be made before "the start of trial." Fed. R. Crim. P. 12(c). In so holding,

---

[5] The referenced rule, Administrative Order No. 00-AO-060, actually instructs that if, "[i]n preparation for resolution of a motion challenging the composition of a jury wheel or panel on the basis of race or ethnicity or both," a party moves for information beyond juror number, race, or Hispanic ethnicity, "such motion will be referred to the Chief Judge." Order No. 00-AO-060 (Disclosure of Juror Information), E.D. Mich. (Oct. 9, 2000), http://www.mied.uscourts.gov/PDFFIles/00-AO-060.pdf [https://perma.cc/G375-CULP]. In their oral motion, defendants did not originally ask for this type of information; however, when the defendants filed their written motions to the Chief Judge, they did request this type of information.

17

the Chief Judge concluded that trial commences at the *start* of voir dire. Finding no good cause

for delay under Rule 12(c)(3), the Chief Judge refused to entertain the jury pool challenge.[6]

This court reviews a challenge to the composition of petit jurors *de novo*. *United States v. Ovalle*, 136 F.3d 1092, 1100 (6th Cir. 1998); *United States v. Allen*, 160 F.3d 1096, 1101 (6th Cir. 1998). A district court's refusal to find good cause and prejudice to excuse an untimely Rule 12 challenge is reviewed for abuse of discretion. *Soto*, 794 F.3d at 655; *see also United States v. Edmond*, 815 F.3d 1032, 1043 (6th Cir. 2016), *rev'd on other grounds*, 137 S. Ct. 1577 (2017).

"The Sixth Amendment secures to criminal defendants the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community." *Berghuis v. Smith*, 559 U.S. 314, 319 (2010). And Federal Rule of Criminal Procedure 12 controls the timing of making a constitutional challenge to jury composition. *Davis v. United States*, 411 U.S. 233, 236–37 (1973); *United States v. Boulding*, 412 F. App'x 798, 802 (6th Cir. 2011). Rule 12(b)(3) states that a motion challenging jury composition "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3). Rule 12(c) then instructs that such motions must be filed by the deadline set by the court, and, if the court does not set a deadline, "the deadline is the start of trial." Fed. R. Crim. P. 12(c)(1). If a party does not move by this deadline, then the party must show good cause as to why the court should consider the untimely motion. Fed. R. Crim. P. 12(c)(3).

Appellants and the government focus their argument on whether the oral motion raised two days into voir dire was raised after the "start of trial" under Rule 12(c)(1) and thus time-

---

[6] The Chief Judge also held that that because defendants' jury pool challenge was untimely, their motion for disclosure was moot.

barred, absent good cause. The government argues that the "start of trial" cutoff under Rule 12(c)(1) requires that a challenge to the jury pool be brought before voir dire begins. Appellants instead assert that trial "starts" when jeopardy attaches, which, in a jury trial, is when the jury is sworn in.[7] *E.g.*, *Martinez v. Illinois*, 134 S. Ct. 2070, 2074 (2014) (per curiam).

We believe that the 2014 Amendments to the federal rules clarify that for Rule 12 purposes, absent a deadline set by the court, trial does not "start" until jeopardy attaches. The advisory committee notes accompanying the 2014 Amendments to 12(c), which added the "start of trial" language, state:

> Paragraph (c)(1) retains the existing provisions for establishing the time when pretrial motions must be made, and adds a sentence stating that unless the court sets a deadline, the deadline for pretrial motions is the start of trial, *so that motions may be ruled upon before jeopardy attaches*.

Fed. R. Crim. P. 12 advisory committee's note to 2014 amendments (emphasis added). Thus, the committee notes make clear that the swearing-in of the jury serves as the "start of trial." The Chief Judge therefore erred in holding that the motion during voir dire was untimely. However, because the oral motion failed to make a prima facie constitutional fair-cross-section claim, even though it was timely, it was still properly denied.

To succeed in making a prima facie case of a violation of the fair-cross-section requirement, a defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

---

[7] Normally a district judge will set a deadline for pretrial motions, eliminating the need to assess the precise "start" of trial under 12(c)(1). This case, however, originally involved over a dozen defendants and was repeatedly rescheduled (two defendants were ultimately tried separately), and the record does not indicate a final formalized deadline for filing pretrial motions.

*Duren v. Missouri*, 439 U.S. 357, 364 (1979). "Exclusion is 'systematic' if it is 'inherent in the particular jury-selection process utilized.'" *United States v. Suggs*, 531 F. App'x 609, 619 (6th Cir. 2013) (quoting *Duren*, 439 U.S. at 366). It is not sufficient to make general observations about the assembled venire. *See Allen*, 160 F.3d at 1103 (noting that defendants "must show more than that their particular panel was unrepresentative"). Thus, the defendants should have made a motion outlining the aspects of the Eastern District of Michigan's jury pool selection process that lead to systematic exclusion of African Americans before the start of trial.

Here, however, the defendants did not make even a preliminary showing of systematic exclusion. The motion during voir dire related only to observations about the assembled venire—not the jury selection process.[8] After the district judge instructed that matters related to jury composition must go before the Chief Judge, the defendants hastened to note that they were making their oral motion before "jeopardy will attach." But despite counsels' demonstrated awareness of the importance of filing the motion in a timely manner, defendants did not file their motions with the Chief Judge until over two weeks later—long after the jury was sworn in. Defendants should have instead immediately filed a motion meeting the prima facie requirements for a constitutional cross-section challenge or a motion requesting additional disclosures with the Chief Judge. By delaying two weeks, the 12(c)(1) deadline passed.

In sum, although Rule 12 does not categorically bar constitutional fair-cross-section claims raised during voir dire, such a motion must at least allege a prima facie case of systematic exclusion. Thus, motions made during voir dire will likely require defense counsel to move

---

[8] This is further demonstrated by the later requests and arguments made in defendants' untimely motion for disclosure filed with the Chief Judge. In that motion, the defendants stated that "examination of these [jury selection] materials . . . will allow for an objective analysis of the formula employed by the Eastern District of Michigan to determine if there is underrepresentation of African-Americans in the jury pool as a result of a constitutional deprivation or systematic exclusion." DE 412, Mot. for Disclosure, Page ID 1917. This shows that the defendants had not yet decided for themselves, much less presented to the court, that there was systematic exclusion at the time of the oral motion two weeks prior.

quickly to either request disclosure of nonpublic information or to use publicly available information to make a prima facie showing of systematic exclusion before the jury is sworn. Here, defendants did neither. They did not use the ample public information available detailing the Eastern District's jury pool selection method[9] to make their motion before the district judge, and they did not bring their motions before the Chief Judge until well after jeopardy attached. Thus, although trial does not "start" until jeopardy attaches, defendants would be well advised to bring these motions before voir dire.

IV.

Nicholson, Johnson, Jackson, Sorrell, and Schamante challenge the district court's handling of a *Remmer* hearing and the court's denial of their joint motion for mistrial on the issue. The district court did not err in denying defendants' motion for a mistrial based on the *Remmer* hearing.

Midway through trial, the court received a note from Juror 11 in which he reported being followed by two people in a car. Before alerting the court, Juror 11 informed his fellow jurors of the incident. The court then held a *Remmer* hearing and called each juror individually to an *in camera* hearing to assess whether the report of this incident had impacted any juror. Before beginning to question individual jurors, the court allowed counsel for the defendants to submit written questions for the court to consider, and counsel for Jackson did so. The judge asked the individual jurors two questions: (1) "Do you understand that the defendants, in this case, are not involved in [Juror 11's] experience?" and (2) "[D]o you feel that you can continue as a fair and unbiased juror, in this case?" DE 451, Tr. Vol. 17, Page ID 4207–08. One juror was excused

---

[9] The Eastern District of Michigan's procedures for drawing potential jurors at that time was publicly available information. *See* Administrative Order No. 13-AO-016 (2013 Juror Selection Plan), E.D. Mich. (Mar. 18, 2013), https://www.mied.uscourts.gov/PDFFIles/13Ao016.pdf [https://perma.cc/VCG8-KPMP]; Administrative Order No. 13-AO-011 (Amended Master Jury Wheels), E.D. Mich. (Feb. 19, 2013), http://www.mied.uscourts.gov/PDFFIles/13AO011.pdf [https://perma.cc/2FML-N7QA].

after stating that the incident would make her more cautious. All other jurors (including Juror 11) reported that they were not impacted and could continue to be fair jurors. The court found that the jurors testified credibly and concluded that there was no credible allegation of extraneous influences.

This circuit reviews a district court's decision not to grant a mistrial after investigating allegations of unauthorized contact with jurors for abuse of discretion. *United States v. Pennell*, 737 F.2d 521, 533 (6th Cir. 1984). Appellants argue that that the court did not do enough to ascertain what each individual thought and felt about the incident. Some of the appellants also argue that defense counsel should have been allowed to directly question jurors individually and under oath. Neither argument has merit.

When the court learns of possible outside influences on the jury, it must conduct a hearing to investigate. *Remmer v. United States*, 347 U.S. 227, 229–30 (1954). However, "[t]he district court retains considerable discretion in deciding how to conduct such an inquiry." *United States v. Taylor*, 814 F.3d 340, 348 (6th Cir. 2016). The defense bears the burden of proving prejudice, and "if a district court views juror assurances of continued impartiality to be credible, the court may rely upon such assurances in deciding whether a defendant has satisfied the burden of proving actual prejudice." *Pennell*, 737 F.2d at 533.

Appellants first argue that the district court failed to engage in a searching inquiry and that the questions were not phrased to elicit honest responses. The Sixth Circuit, however, has recently spoken on this point. In *United States v. Taylor*, the panel affirmed a district court's *Remmer* hearing as effective, noting that the appellant's argument centered not on a denial of opportunity to establish bias, "but on the district court's not having questioned the jurors as extensively as [the defendant] would have liked." *Taylor*, 814 F.3d at 350. It held that "[a]ll that

*Remmer* requires is that the defendant be given an opportunity to prove juror bias, not that he be given the opportunity to prove juror bias based on answers to pre-determined questions." *Id.* at 351 (internal citation omitted).

Appellants next claim that defense counsel should have had the opportunity to directly question the jurors during the *Remmer* hearing—though none of the defense attorneys actually requested this during the proceeding. They contend that *United States v. Corrado*, 227 F.3d 528 (6th Cir. 2000), mandates that defense counsel be permitted to directly question jurors about potential bias. However, this case does not mandate defense counsel participation in every *Remmer* hearing, and both precedent and common sense indicate that the district court judge can accurately and effectively assess issues of juror outside influence, particularly when these issues arise in the middle of trial. *United States v. Sturman*, 951 F.2d 1466, 1478 (6th Cir. 1991) ("[W]hen the questioning of the jurors occurs during the trial it is preferable it be done by the judge. Jurors may resent being questioned directly by counsel."); *see also Taylor*, 814 F.3d at 348–49.

Here, upon receiving the note from Juror 11, the district court immediately questioned the jurors individually. This questioning, though not phrased precisely how defendants may have wished, allowed the court to sufficiently probe whether each juror had been impacted by the reported incident. The effectiveness of this questioning is exemplified by the court's decision to excuse one of the jurors. The district court did not commit an abuse of discretion in questioning the jurors itself and refusing to ask the defense counsel's proffered questions.

V.

The appellants next raise two arguments related to the jury instructions. A district court's decision not to give proposed jury instructions is reviewed for abuse of discretion. *United States*

*v. LaVictor*, 848 F.3d 428, 453–54 (6th Cir. 2017), *cert. denied*, 137 S. Ct. 2231 (2017). "A refusal to give requested instructions is reversible error only if (1) the instructions are correct statements of the law; (2) the instructions are not substantially covered by other delivered charges; and (3) the failure to give the instruction impairs the defendant's theory of the case." *Id.* at 454 (citing *United States v. Newcomb*, 6 F.3d 1129, 1132 (6th Cir. 1993)). The court reviews objections to instructions not raised at trial for plain error. *United States v. Lechner*, 806 F.3d 869, 880 (6th Cir. 2015).

## A.

The defendants first challenge the district court's refusal to instruct the jury on what they refer to as "subjective intent."

In the "General Principles" portion of the jury instructions, the district court included Sixth Circuit Pattern Jury Instruction 2.08, which provides jurors guidance on how to infer the mental state of defendants to determine whether the required *mens rea* elements are met for each charge.[10] Counsel for defendants jointly requested that this instruction also state: "Speech is protected by the First Amendment. Unless you find beyond a reasonable doubt that the Defendants subjectively intended to carry out the conduct he [sic] verbally articulated." DE 464, Trial Tr. Vol. 24(A), Page ID 5637. Defense counsel argued that this instruction would likely be required under *Elonis v. United States*, 135 S. Ct 2001 (2015), which was pending before the Supreme Court at that time.

---

[10] The district court instructed in relevant part:

> Ordinarily, there is no way that a Defendant's state of mind can be proved directly because no one can read another person's mind and tell what that person is thinking. But a Defendant's state of mind can be proved indirectly from the surrounding circumstances. This includes things like what the Defendant said, what the Defendant did, how the Defendant acted, and any other facts or circumstances in evidence that show what was in the Defendant's mind.

DE 658, Trial Tr. Vol. 27, Page ID 8542–43.

The district court rightly denied this requested instruction, as *Elonis* is wholly inapplicable to this case.[11]   *Elonis*'s reasoning and precedential force only extend to cases involving threat crimes related to speech activities—not to jury instructions in cases involving mental states for crimes of violence or conspiracy.  *See Elonis*, 135 S. Ct. at 2012 (declining to consider any First Amendment issues).   The government's brief correctly notes that the "[d]efendants' argument fails to distinguish between statutes that penalize certain communications themselves, and using statements as evidence of the existence and purpose of an agreement."   CA6 R.58, Gov't Br., at 127.   The given instruction—Pattern Jury Instruction 2.08—rightly instructed the jury that they could consider a defendant's speech as evidence of his intent or agreement.  In addition to this instruction, the jury was specifically instructed as to each crime charged and on the government's duty to prove every element—including *mens rea* elements—beyond a reasonable doubt.

Given that the defendants' proposed instruction was a misstatement of the law and that the given instructions adequately covered the relevant charges, the district court did not abuse its discretion by refusing to give the "subjective intent" instruction.

---

[11] In *Elonis* the defendant was convicted of transmitting a threat in interstate commerce under 18 U.S.C. § 875(c) after the jury was instructed that a "true threat" is one that the speaker intentionally makes that would cause a reasonable person to fear bodily injury or death—essentially allowing conviction based on negligence. *See Elonis*, 135 S. Ct. at 2007, 2011–12. The Supreme Court reversed, holding that § 875(c) required a mental state higher than negligence. *Id.* at 2012–13. The Court noted that its conclusion was based on interpretation of § 875 and expressly refused to consider any First Amendment issues. *Id.* at 2012.

B.

Johnson also argues that the jury was improperly instructed that Carl Miller was not a co-conspirator and asks this court to review the instruction for plain error. Because Johnson requested the instruction he now challenges, the invited error doctrine precludes this challenge on appeal.

The invited error doctrine "holds that a party may not complain on appeal of errors that he himself invited or provoked the court or the opposite party to make." *United States v. Barrow*, 118 F.3d 482, 490 (6th Cir. 1997); *see also Lechner*, 806 F.3d at 880; *United States v. Sharpe*, 996 F.2d 125, 128–29 (6th Cir. 1993). At trial, Johnson's counsel participated in the request that the jury be instructed that Carl Miller, who served as a government informant, could not be considered a co-conspirator, and the government and Johnson's counsel specifically agreed on the instruction now at issue. Although the invited error doctrine "does not foreclose relief when the interests of justice demand otherwise," justice does not so demand in this case, as Johnson merely challenges the instruction as incorrect—not a as a serious breach of his constitutional rights. *See Barrow*, 118 F.3d at 491 (entertaining a challenge to jointly submitted jury instructions that allegedly violated defendant's constitutional rights and distinguishing from *Sharpe*, where "the defendant . . . was simply challenging the jury instructions as faulty"). Moreover, though the invited error doctrine forecloses Johnson's claim, we note that the given instruction was a correct statement of law. *See, e.g.*, *United States v. Deitz*, 577 F.3d 672, 681 (6th Cir. 2009) (stating that "[the informant's] status as a government agent prevents the government from proving the existence of a conspiracy solely between [the defendant] and [the informant]").

VI.

Sorrell raises two constitutional claims, neither of which have merit.

A.

Sorrell first claims that his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel were violated by Miller's recording of Sorrell between September and October 2013. At the time of these recordings, Sorrell had been arraigned and was represented in Michigan state court on charges related to unlawfully driving an automobile. On the tenth day of trial in district court, Sorrell's counsel made a motion to suppress these recordings, alleging that they violated Sorrell's Sixth Amendment right to counsel. The court found this motion untimely, noting that there was no good cause for delay. The court later ruled that even had the motion been timely, suppression was not warranted under the Sixth Amendment. Sorrell did not raise the Fifth Amendment argument at trial.

This court reviews the district court's determination that a defendant has not established good cause for delay under Rule 12(c)(3) for abuse of discretion. *Soto*, 794 F.3d at 655. It reviews suppression claims raised for the first time on appeal for plain error. *Id.*

The district court did not abuse its discretion in finding that there was no good cause for Sorrell's delay in raising his Sixth Amendment claim. *See* Fed. R. Crim. P. 12(b)(3)(C), (c)(3). Sorrell acknowledged that the motion was untimely, and the record indicates that Sorrell's counsel had notice of the recordings at least fifteen months before trial began. Further, even were Sorrell to show good cause, his Sixth Amendment claim is meritless. At the time of the recordings he was not represented by counsel as to the charges in this case, and the charges in the pending state court case were not for the same offense. *See Texas v. Cobb*, 532 U.S. 162, 173 (2001) (adopting the *Blockburger v. United States*, 284 U.S. 299 (1932), "same offense" test for

attachment of Sixth Amendment right to counsel). Thus, his Sixth Amendment right to counsel is not implicated here. *Id.*; *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991).

Sorrell's Fifth Amendment claim is equally unpersuasive. The voluntary conversations that Sorrell had with Miller were not interrogations, and Sorrell was not in custody at the time of any of the conversations. *See Miranda v. Arizona*, 384 U.S. 436 (1966); *see also Thompson v. Keohane*, 516 U.S. 99, 102 (1995). The district court did not err in refusing to suppress the recordings.

## B.

Sorrell next argues that the government wrongly suppressed exculpatory medical bills in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). After Sorrell was convicted and sentenced, the government filed an application for victim restitution as to Leon McGee for his injuries from the September 2013 shooting. Attached to this motion were medical bills from McGee's time in the hospital that had not been previously provided to Sorrell's counsel.

Because the alleged *Brady* violation was not first raised with the district court, this court reviews for plain error only.[12] *United States v. Crayton*, 357 F.3d 560, 569 (6th Cir. 2004) ("[When] the defense counsel did not make a motion for a mistrial or raise the question of a possible *Brady* violation to the district court, we review at most for plain error."); *United States v. Dhaliwal*, 464 F. App'x 498, 504 (6th Cir. 2012).

To succeed on a *Brady* claim, a defendant must show: (1) that the evidence in question is favorable, (2) that the state purposefully or inadvertently suppressed the relevant evidence, and

---

[12] Instead of moving for a new trial with the district court, Sorrell initially raised his *Brady* argument for the first time on appeal. On September 1, 2017—after the filing of all briefs in this appeal—Sorrell made a motion for new a trial in the district court pursuant to Federal Rule of Criminal Procedure 33 related to the medical bill evidence. The trial court, however, could not rule on that motion during this pending appeal. Fed. R. Crim. P. 33(b)(1) ("If an appeal is pending, the court may not grant a motion for a new trial until the appellate court remands the case."); *see United States v. Blanton*, 697 F.2d 146, 148 (6th Cir. 1983).

(3) that the state's actions resulted in prejudice. *Bell v. Bell*, 512 F.3d 223, 231 (6th Cir. 2008); *see also Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). The prejudice prong of this test requires that "there [be] a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (quoting *Cone v. Bell*, 556 U.S. 449, 470 (2009)).

These medical bills' utter lack of materiality is enough to dispose of Sorrell's *Brady* claim. Sorrell argues that the bills could have been used to impeach government witnesses' testimony because they do not specifically indicate that McGee was shot in the face. This argument is unpersuasive. First, Sorrell's charge related to this incident is assault with a deadly weapon, which is not tied to the location of the victim's wound. Second, there was substantial evidence presented at trial—including Sorrell's own statements caught on recording—that Sorrell shot McGee. Finally, there was ample additional evidence at trial showing that McGee suffered gunshot wounds to the face. Although these hospital bills were not introduced, McGee's hospital records were, and these stated that McGee that he received a gunshot wound "to the face" and "had some bullet fragments in his face." DE 739, Gov't Ex. 61, Page ID 11009, 11007. The prosecution even introduced one such fragment at trial, and McGee testified that it had been pulled from his face. Thus, Sorrell's *Brady* claim is without merit.

VII.

Jackson challenges denial of his pretrial motion to exclude evidence that he "allegedly admitted to supplying a gun that was used by one of the co-defendants in the attempted robbery and shooting of members of the Satan's Sidekicks Motorcycle Club on September 9, 2013." DE 396, Jackson Mot. *in limine*, Page ID 1800. (This was the shooting of Leon McGee.) Jackson argues that this evidence should have been excluded under Federal Rule of Evidence 404(b),

401, or 403. This court reviews a district court's admissibility determinations for abuse of discretion. *United States v. Rios*, 830 F.3d 403, 426 (6th Cir. 2016). The district court properly denied Jackson's motion.

First, Rule 404(b)'s prohibition on using other "crimes, wrongs, or acts" to prove a Defendant's character does not mandate exclusion here. Fed. R. Evid. 404(b). Jackson was charged with conspiracy to commit murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(5). The existence of a racketeering enterprise and Jackson's participation in that enterprise are essential elements of this crime, and the Satan's Sidekick shooting was one of the primary events used at trial to demonstrate PMC's racketeering activities. This incident is therefore "intrinsic" to Jackson's charge and conviction. *See United States v. Marrero*, 651 F.3d 453, 471 (6th Cir. 2011) ("Where the challenged evidence is 'intrinsic' to, or 'inextricably intertwined' with evidence of, the crime charged, Rule 404(b) is not applicable." (quoting *United States v. Henderson*, 626 F.3d 326, 338 (6th Cir. 2010))); *United States v. Hardy*, 228 F.3d 745, 748 (6th Cir. 2000) (noting that "[p]roper background evidence" includes evidence that is "a prelude to the charged offense [and] is directly probative of the charged offense."). Thus, Rule 404(b) did not bar admission of this testimony. For the same reasons, this evidence is relevant under Rule 401.

Even if probative, Jackson asserts the evidence should have been excluded as unfairly prejudicial under Rule 403. The alleged unfair prejudice here is the jury's exposure to "[g]un violence involving rival motorcycle clubs." DE 396, Jackson Mot. *in limine*, Page ID 1803. This purported prejudice—discussion of motorcycle club violence—was, however, the subject of defendants' entire trial and served as the basis for Jackson's murder conspiracy conviction. Any

potential prejudice, therefore, does not substantially outweigh the probative value of this evidence. The district court did not abuse its discretion in refusing to exclude this evidence.

VIII.

Schamante, Jackson, Brown, and Sorrell each challenge their respective sentences imposed by the district court. This court reviews a district court's factual findings at sentencing for clear error and its application of the Sentencing Guidelines *de novo*. *E.g.*, *United States v. Hazelwood*, 398 F.3d 792, 795 (6th Cir. 2005). The ultimate sentence is reviewed for reasonableness, using an abuse of discretion standard. *E.g.*, *Gall v. United States*, 552 U.S. 38, 51 (2007); *United States v. Young*, 847 F.3d 328, 370 (6th Cir. 2017). Denial of a mitigating-role reduction is reviewed for clear error. *See United States v. Randolph*, 794 F.3d 602, 616 (6th Cir. 2015). The district court did not err in calculating or imposing any of these sentences.

A.

Schamante was convicted of RICO conspiracy and possession of an unregistered firearm and sentenced to 102 months in prison. He now challenges two of the sentencing court's factual determinations.

Schamante first challenges the determination that he was involved in trafficking stolen motorcycles and motorcycle parts across state lines. Schamante, however, raised this objection at his sentencing, and in response the court specifically referenced testimony by another PMC member that Schamante had sold stolen motorcycles. Schamante further argues that the court erred in concluding that it was reasonably foreseeable that another Phantom would use a gun Schamante provided to shoot two people in Columbus, Ohio. But there was ample evidence at trial about Phantoms' violent altercations with other clubs and their interstate travel to support

31

this factual finding. (Schamante's PMC nickname is even "Arsenal.") The district court did not commit clear error in these factual determinations.

Schamante also argues that the court erred in imposing a sentence at the "top end" of the sentencing guideline range. Because the imposed sentence is within the applicable Guidelines range, it may be presumed reasonable. *Gall*, 552 U.S. at 51; *United States v. Dunning*, 857 F.3d 342, 350–51 (6th Cir. 2017). We apply this presumption of reasonableness and affirm the sentence imposed by the district court.

B.

Jackson was sentenced to 93 months in prison for his conviction for conspiracy to commit murder in aid of racketeering under 18 U.S.C. § 1959(a)(5). He now challenges this sentence based on the application of U.S. Sentencing Guideline ("USSG") § 2E1.3 and the district court's denial of the requested mitigating-role reduction. The district court applied the correct base offense level and did not clearly err in applying a minor-participant reduction instead of a minimal-participant reduction.

Jackson first alleges that the district court incorrectly calculated his base offense level as 33 and argues that it instead should have been 19 under the applicable sentencing guideline, USSG § 2E1.3. The applicable guideline, USSG § 2E1.3 (Violent Crimes in Aid of Racketeering Activity), instructs: "(a) Base Offense Level (Apply the greater): (1) 12; or (2) the offense level applicable to the underlying crime or racketeering activity." Application Note 1 explains that if the underlying conduct violates state law, as here, "the offense level corresponding to the most analogous federal offense is to be used." USSG § 2E1.3 cmt.1. Jackson's conviction for conspiracy to commit murder is most analogous to the federal offense under 18 U.S.C. § 1117 (Conspiracy or Solicitation to Commit Murder), which appears in the

Sentencing Guidelines at USSG § 2A1.5. Therefore, § 2E1.3(a)(2) instructs the court to cross-reference § 2A1.5—Conspiracy or Solicitation to Commit Murder—which has a base offense level of 33. Thus, because § 2E1.3(a) instructs the court to "[a]pply the greater" of 12 or the base offense level for the underlying crime, the court used 33 as Jackson's base offense level.

Jackson contends instead that racketeering itself should have served as the "underlying crime or racketeering activity" under § 2E1.3(a)(2). He argues that § 2E1.3(a)(2) allows the court to calculate the alternative base offense level by looking to *either* "the underlying crime" *or* to "racketeering activity." Thus, because racketeering activity carries a base offense level of 19, he believes that 19 should have been used, or at the very least considered, as his base offense level.

Jackson's argument, however, is flawed for several reasons. First, his reading goes against the plain language of the Guidelines instruction: to pick the greater between two options. Second, the base offense level used in sentencing under this guideline is designed to vary in reference to the seriousness of the violent crime undertaken in aid of racketeering, and bifurcation of § 2E1.3(a)(2) would defeat the sliding-scale VICAR sentencing inquiry. Finally, and perhaps most fatally, were we to accept Jackson's argument and look to "racketeering activity" itself as a source of the base offense level, it would not actually yield his desired result. This is because the sentencing guideline for general racketeering activity instructs the court to apply the greater of base offense level "(1) 19; or (2) the offense level applicable to the underlying racketeering activity." USSG § 2E1.1. Thus, even were we to look to § 2E1.1 for § 2E1.3(a)(2)'s "racketeering activity," § 2E1.1(a)(2) would take us back to where we started— § 2A1.5 (Conspiracy or Solicitation to Commit Murder), carrying a base offense level of 33. The district court did not err in sentencing Jackson subject to a base offense level of 33.

Jackson also claims that he should have been given a four-level "minimal participant" reduction pursuant to USSG § 3B1.2(a) instead of the two-level "minor participant" reduction granted by the district court under § 3B1.2(b). A minimal-participant reduction is meant to cover defendants "who are plainly among the least culpable of those involved in the conduct of a group." USSG § 3B1.2 cmt.4. A minor participant, in contrast, is one "who is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." *Id.* at cmt.5.

The district court did not commit clear error in finding that Jackson was a minor participant instead of a minimal participant. Jackson, though not a ringleader in the Hell Lover murder conspiracy, played more than a minimal role—there was evidence at trial and sentencing showing that Jackson actively participated, including by sharing information about targets with others in the conspiracy. Further, application of a mitigating-role reduction and the correct level thereof is a fact-based determination that requires careful balancing and allows the sentencing court to exercise discretion. *See United States v. Salas*, 455 F.3d 637, 643 (6th Cir. 2006) ("Simply because the court *could* have applied a minor role adjustment under the facts of this case . . . does not mean that the district court was *required* to apply the adjustment." (quoting *United States v. Garcia-Morones*, 49 F. App'x 556, 558 (6th Cir. 2002))). The sentencing court presided over the trial where the relevant evidence was produced, and it sufficiently probed Jackson's involvement in the conspiracy in selecting the minimal-participant reduction.

Finally, Jackson asserts that the district court erred in refusing to apply a three-level reduction to his offense level under USSG § 2X1.1. The district court correctly held that § 2X1.1 does not apply in this case, as § 2X1.1(b) only applies when an attempt, solicitation, or conspiracy is not "expressly covered" by another offense guideline section. USSG § 2X1.1(c).

Because Jackson's conspiracy conviction is covered by the specific "Conspiracy or Solicitation to Commit Murder" sentencing guidelines in USSG § 2A1.5, § 2X1.1 is expressly inapplicable. *See also United States v. James*, 575 F. App'x 588, 592 (6th Cir. 2014).

C.

Brown was sentenced to 100 months in prison for his conviction for conspiracy to commit murder in aid of racketeering under 18 U.S.C. § 1959(a)(5). Brown first raises the same argument put forward by Jackson regarding the calculation of his base offense level under § 2E1.3(a)(2), and this argument is meritless for the same reasons.

Brown next asserts that he should have been granted a mitigating-role reduction due to the small extent of his participation in the conspiracy.[13] We do not believe that the district court clearly erred in not applying this reduction, because facts on the record support that Brown was actively involved in the conspiracy to murder Hell Lovers. Further, although the sentencing court did not vary Brown's base offense level, it "varied down from the 120-month guideline range" and imposed a 100-month sentence applying the factors in 18 U.S.C. § 3553(a) because it concluded that Brown's involvement "was not minimal but was involved but not at a leadership position." DE 666, Brown Sentencing Tr., Page ID 8932. This demonstrates that, although his base offense level was not reduced, the court actively and adequately considered Brown's level of involvement in the conspiracy when imposing the sentence. We affirm his sentence.

---

[13] The government contends that Brown's mitigating-role-reduction argument should be reviewed for plain error only, as it was not raised below. *See United States v. Ells*, 687 F. App'x 485, 486 (6th Cir. 2017) (mem); *United States v. Ellerbee*, 73 F.3d 105, 108 (6th Cir. 1996). Brown's attorney, however, referenced mitigation at the sentencing hearing, stating: "I know there's different levels of participation and different things. . . . But looking at the totality of the circumstances, I think Mr. Brown's role is very minimal in that plot." DE 666, Brown Sentencing Tr., Page ID 8926. Mitigation was also raised in Brown's sentencing memorandum, which stated: "Mr. Brown's role in the PMC is a basis for a variance based upon [his] minor/minimal role[ ]. These factors should warrant a departure or variance from the applicable statutory maximum . . . ." DE 596, Brown Sentencing Mem., Page ID 7387. Therefore, we review the district court for clear, not plain, error.

D.

Sorrell was sentenced to a total term of 252 months for his convictions on five counts. He claims that the district court improperly calculated his base offense level and challenges the application of a 10-year mandatory minimum based on his conviction under 18 U.S.C. § 924(c)(2).

Sorrell's argument that his sentence was "improperly scored" is the same one raised by Jackson and Brown as to USSG § 2E1.3(a)(2) and is rejected for the same reasons. His argument related to the mandatory minimum is equally without merit. Sorrell was sentenced to a 10-year mandatory minimum pursuant to his 18 U.S.C. § 924(c) conviction. Sorrell originally argued that this mandatory sentence only applies to individuals who have committed prior crimes of violence in a seemingly mistaken reference to 18 U.S.C. § 924(e). Sorrell, however, was convicted of and sentenced under § 924(c)(1)(A), which provides for a 10-year minimum when a firearm is discharged during a crime of violence. In its verdict, the jury specifically found that the firearm was discharged, and at sentencing Sorrell's counsel acknowledged that the 10-year minimum was applicable to this conviction. Additionally, in his reply brief, Sorrell acknowledged that the 10-year minimum was correctly applied. Application of the mandatory minimum was not error, and we affirm his sentence.

IX.

Accordingly, the defendants' convictions and sentences are affirmed.